COMMONWEALTH *vs*. RICHARD T. CHALIFOUX.

Bristol.    November 7, 1972. — January 15, 1973.

Present: TAURO, C.J., REARDON, HENNESSEY, KAPLAN, & WILKINS, JJ.

*Evidence,* Other offence, Of state of mind, Photograph, On Cross-examination.

At the trial of indictments for assault and battery, kidnapping, and uttering a threat to kill, there was no error in admitting testimony by the woman victim that during the course of the crimes the defendant had talked "about things that . . . had happened when he was in jail" [815–816]; in allowing the victim to testify on redirect examination, to offset the defendant's insinuation that the crimes occurred during a lover's quarrel, as to a prior assault on her by him [816–817]; or in admitting in evidence pictures of the victim taken by her girl friend shortly after the crimes to corroborate oral testimony as to the victim's condition and to counteract a contention that her injuries came from a fall from a car [817].

At the trial of indictments for crimes against a woman, there was no error in the extent of the prosecutor's cross-examination of the defendant's mother with respect to her alleged telephone conversations with the victim, as to which the mother had testified on direct examination. [818–820]

INDICTMENTS found and returned in the Superior Court on June 16, 1971.

The cases were tried before *Leen, J.*

*Robert A. Stanziani* for the defendant.

*David Vigoda,* Assistant Attorney General, for the Commonwealth.

KAPLAN, J.  The defendant was found guilty by a Bristol County jury upon indictments for assault and battery by means of a dangerous weapon, to wit, a billy club; kidnapping; and uttering a threat to kill.  He was sentenced to imprisonment for a term of eight to ten years for the first offence and to the same term for the second offence, the sentence to be served after the first, with execution suspended for six years and probation. The indictment for the third offence was placed on file. The case was taken under G. L. c. 278, §§ 33A–33G, and is here on the defendant's assignments of error questioning the judge's rulings in the course of trial.

The jury under their verdict could have found the facts as follows.  The complaining witness, Mrs. H., a divorced woman, met the defendant in January, 1971.  They became sexually intimate.  In March Mrs. H. tried to break off the relationship but was deterred by fear that the defendant would harm her.

On April 10, the Saturday before Easter Sunday, the defendant visited Mrs. H. at 5:30 or 6 P.M. at her house in Stoughton where she lived with her daughter and parents.  The two had a drink and discussed ending the affair.  The defendant seemed to acquiesce in this.  At about six-thirty they drove in Mrs. H.'s car to the defendant's camper located beside his parents' house in Mansfield.  They remained at the camper for a short interval during which the defendant said that she would be making a mistake to break it up.  Again in fear, Mrs. H. said they would talk about it later.  The plan had been to leave the defendant at the camper and for Mrs. H. to drive alone to visit her girl friend, Mrs. C., in Foxboro where she was to stay the night.  But as the defendant

wanted to use her car during the evening, they started out for Foxboro with the defendant driving. The defendant then said if she really wanted to break it up, there wouldn't be any trouble; he wouldn't hurt her or any-· thing. Mrs. H. said that was fine. Instantly the defendant jammed on the brakes, turned the car around, and raced back to the camper.

They reached the camper at about 7:30 P.M. The defendant ordered Mrs. H. out of the car. She refused and there was a sharp struggle in which the windshield of the car was cracked or broken. The defendant pulled her out of the car and as she lay on the ground he put his knee to her throat and covered her mouth. He dragged her, resisting, up some stairs into the camper.

He threw her down on the floor and then seized her by the shoulders, shook her violently from side to side, and beat her head against a refrigerator and window. He took out a metal club some fifteen to eighteen inches long with a leather strap or thong attached. He ordered her to take her clothes off and tore at them until she was naked. He hit and poked her with the club and whipped her with the strap. Having forced her into the bed he ordered her out and had her stand with her hands to the ceiling of the camper and beat and poked her with the club when she lowered her hands.

He said [1] she was playing him for a fool, a "sucker"; he had had enough of stupid "broads" like her; he would fix her; when he was in jail the guards had treated him and the others like animals, now she could get an idea of what it was like; she had had it this time; he would kill her this time; she deserved to die and he would do it to her; he would bury her back of the camper in the pasture and run her car off the road and abandon it. [2] Mrs. H. begged the defendant to stop; if he let her live she would stay with him or leave him as he wanted; she wouldn't tell

---

[1] The exact order of the various statements is not preserved here.

[2] At one point he took her clothes saying he would burn them and, securing the door, he went out indicating he would dispose of them in a pit nearby.

anyone; she would say she had fallen out of the car and that was why she had marks on her body. At length the beatings ceased and she was allowed to get into bed at about 11:45 P.M. The defendant lay alongside her.

At six o'clock in the morning they dressed — Mrs. H. in her Easter clothes that had remained in the car. The defendant warned that if she ever told, they'd never get him before he got her, and he'd take care of her and her family and her girl friend and the girl friend's kids. He drove Mrs. H. to Mrs. C.'s house, left her there, and went on with her car. Mrs. C. observed that Mrs. H. was badly shaken and Mrs. H. exhibited her bruises to her and told her what had happened. They went to church with Mrs. C.'s two children and Mrs. H.'s daughter. Thereafter Mrs. H. and her daughter took lunch nearby with her in-laws. That afternoon Mrs. H. telephoned the defendant. She said she hadn't told anyone and asked the defendant to take her home with her daughter, and he complied.

It appears that Mrs. H. had medical attention the following day. The defendant came to her house that night. She assured him that she had said it was an accident. When she asked why didn't he leave her alone, he said if she started that again he would "go right through" that house and her father and mother.

The next day, Tuesday, Mrs. H. and Mrs. C. went to the police in Mansfield. They had previously assured themselves by speaking to a State trooper that if charges were brought against the defendant he could be arrested and detained. The defendant was promptly charged and held and the camper searched. On Wednesday morning Mrs. C. took photographs in color of Mrs. H. partially disrobed. This was at the suggestion of the police.[3] Later the same morning a police matron examined Mrs. H. and took note of her bruises.

---

[3] Apparently photographic facilities were not available at that police station at the time.

We now mention briefly the version of the facts tendered by the defence. According to testimony of the defendant's father and mother and of a friend of the defendant's brother, the defendant and Mrs. H. at about 7:15 P.M. on Saturday came to the house, not the camper. Mrs. H. was bedraggled and somewhat the worse for drink and explained her condition by saying that she had fallen out of the car presumably en route to the house. She and the defendant remained in the house drinking with the defendant's parents. At about 11 P.M. she was still there asleep on a couch.

In explanation of why Mrs. H. might bring false charges against the defendant, it was suggested that the defendant had stopped dating Mrs. H. for some period in March and had favored another woman, and that Mrs. H. had importuned him to return to her. According to this story it was the defendant, not Mrs. H., who was the reluctant partner in the affair, and Mrs. H. had accused the defendant out of a mixture of resentment and jealousy.

1. Coming to the assignments of error: In the course of describing what happened in the camper on the night of April 10, Mrs. H. said, "and then he started talking about things that . . . had happened when he was in jail." Defence counsel demanded a mistrial and excepted to the denial of the motion. The judge ruled that the witness might not make her own independent references to jail, but could give the whole of the conversation in the camper in which jail was mentioned. She went on: "He said, 'When I was in jail, the guards and everybody treated us like animals.' He says, 'Now you get an idea of what it's like.' " The defence made no further objection, but now attacks the admission of the entire statement in that it brought before the jury, and at an early stage in the trial, that the defendant had previously committed a crime, and one serious enough to result in a jail term. But while evidence of other criminal or wrongful behavior may not be admitted to prove the character or propensity of the accused as enhancing the probability that he committed the offence for which he is standing

trial, it is admissible for other relevant probative purposes. Compare *Commonwealth* v. *Eagan,* 357 Mass. 585, 589–590, with *Commonwealth* v. *Banuchi,* 335 Mass. 649, 654. *United States* v. *Stirone,* 262 F. 2d 571, 576–577 (3d Cir.). Rules of Evidence for United States Courts and Magistrates (as approved by U. S. Sup. Ct. November 20, 1972), Rule 404 (b). Here the statement was admissible to establish fully what occurred during the main episode in suit; it also bore directly on the frame of mind of the victim, her apprehension as to the defendant's intentions, which went to the proof of the crimes of kidnapping and making a threat to kill. G. L. c. 265, § 26 (Kidnapping: ". . . against his will . . ."); c. 275, § 2 (threat to commit crime: for the meaning of "threat," see *Robinson* v. *Bradley,* 300 F. Supp. 665, 668 [D. Mass.]). If, indeed, the value of the statement as legitimate proof appeared to be substantially outweighed by the danger of prejudice not correctable by the good sense of the jury, a case could be made for excluding it, see *United States* v. *Stirone, supra,* at 576–577; Rules of Evidence, *supra,* Rule 403; McCormick, Evidence (2d ed.) § 185 at pp. 438–441, but the present record does not persuade us to such a conclusion.

2. Testifying on redirect examination, Mrs. H. said she had been trying since March to part from the defendant but had managed a separation for only a few days. She was asked over exception why she had not in fact stopped seeing him. She answered, "Because I was terrified; and he threatened me with a knife when I had broken up with him . . . he followed me in his car, and before I could get out of my car, he held a knife to my throat and he told me he would kill me if I didn't go back with him, and then he would go after the others." This statement about a prior assault, tending to show a continuity of conduct by the defendant, was admissible like the jail testimony to help describe Mrs. H.'s mental and psychological set during the night of April 10. So the judge told the jury. The testimony is, moreover, to be seen as coming after a cross-examination in which the

defence had insinuated that a fracas on April 10 could have been only a lovers' quarrel and Mrs. H. could not have feared the defendant's reaction to a breakup because it was he who had sought it.

3. The defendant claims error in the admission of the pictures of Mrs. H. taken by Mrs. C., which confirmed testimony by Mrs. H., Mrs. C., and the police matron based on direct observation that the bruises extended from the ankles to the neck, front and back. The pictures were duly qualified for admission into evidence by Mrs. C.'s testimony about how she had taken them and her further testimony that Mrs. H.'s condition on Wednesday as pictured corresponded to her condition on Sunday morning. The defence protests, however, that the pictures added nothing to the oral testimony, and could serve only to inflame the jury. But the pictures, besides corroborating that testimony, cf. *Howe* v. *Boston,* 311 Mass. 278, 281–282; *Commonwealth* v. *Valcourt,* 333 Mass. 706, 712, had a distinct purpose at trial. *Commonwealth* v. *D'Agostino,* 344 Mass. 276, 279. *Commonwealth* v. *Martin,* 357 Mass. 190, 192–193. One of the means of meeting the defence contention that Mrs. H. had suffered the bruises through a fall from the car was to show that the injuries were less compatible with such a fall than with a severe beating with the billy club. Although the point could be and was made by oral testimony, it was probably more effectively, because more graphically, demonstrated by the pictures, and it was open to the Commonwealth to proceed on that basis. Having examined the pictures, we do not think they would be particularly incitive or incendiary to a jury in 1971. The judge took exceptional pains in instructing the jury how to weigh the pictures. Again if their evidential value was overwhelmed by their prejudicial effect, it would have been advisable to exclude them, *Commonwealth* v. *D'Agostino, supra,* at 279, although the occasions for exclusion on just that ground have been rare indeed. *Commonwealth* v. *McGarty,* 323 Mass. 435, 438–439. But this was far from being such an occasion.

4. Under another assignment, the defendant attacks the judge's failure properly to control cross-examination by the Commonwealth of the defendant's mother, Mrs. Chalifoux, about certain alleged telephone conversations with Mrs. H.    Mrs. Chalifoux had testified on direct examination by the defence to some insistent telephone calls by Mrs. H. to the house during March in which, as Mrs. Chalifoux claimed, Mrs. H. was seeking to reach the defendant to dissuade him from his new attachment and win him back.    Mrs. Chalifoux said she finally told Mrs. H. to stop calling, the defendant didn't want to speak to her; to which Mrs. H. answered that he wasn't going to drop her, she wouldn't accept it.    On cross-examination, the Commonwealth inquired more particularly about these alleged telephone calls and asked whether, in turn, Mrs. Chalifoux had called Mrs. H.    She answered no.    In particular she was asked about a call in the early morning of a day in March.    After denying any recollection of it, Mrs. Chalifoux allowed that it might help her memory if she was told the purpose of the call.    Thereupon it was suggested that she had called because she couldn't find her husband's gun and wanted to know whether the defendant had it.    There was also an obscure suggestion at this point that the defendant and his father and brother had been "fighting" and the father had left the gun for the defendant to take.    The witness denied she had made such a call.    Defence counsel said he assumed "these allegations" were going to be proved by the Commonwealth, otherwise he would demand a mistrial.[4]

Considerable breadth of cross-examination was rightly

[4] The assignment here discussed (No. 12) is not in terms addressed to the question of the telephone call; rather it covers the defendant's exception to the judge's denial of motions for a directed verdict at the close of the Commonwealth's case.    An exception (No. 24) was taken to the judge's denial of a motion for a mistrial, made at the end of Mrs. Chalifoux's testimony, which can be read as addressed to the telephone call, but that exception was covered by assignment No. 13, which is not mentioned in the defendant's brief.    This oddity may be overlooked, but it will be noted that the mistrial motion came before the Commonwealth had a chance to put on a rebuttal witness.

allowed to both sides in the present case because the credibility of the witnesses was crucial to the triers' choice between contradictory hypotheses about the entire occurrence. The judge took Mrs. Chalifoux's testimony about calls from Mrs. H. as intended to show bias on Mrs. H.'s part caused by her resentment at being rebuffed by the defendant. But if Mrs. Chalifoux had a clear memory of those calls, could she remember calls that she had made to Mrs. H., or was her memory partial? In cross-examining on this line the prosecution did not 'exceed usual and expected bounds, especially as Mrs. Chalifoux was a manifestly hostile witness.

Mrs. H., recalled by the prosecution on rebuttal, was asked whether she had made the calls to the house allegedly answered by Mrs. Chalifoux, and she denied having done so. Then she was asked whether she had received the early morning call from Mrs. Chalifoux, and affirmed that she had. The question was not objected to, but it may be remarked that even if we take the issue of that telephone call to be "collateral," see Wigmore, Evidence (Chadbourn rev.) §§ 1003, 1004, so that Mrs. Chalifoux's denial that she had made it would be the end of the matter in the ordinary situation, here a special factor had entered in. The defence had challenged the Commonwealth by indicating doubt whether it had any factual basis for cross-examining and undertaking to refresh Mrs. Chalifoux on the particular telephone call. Unanswered, this was an aspersion upon the prosecution, see *Commonwealth* v. *Homer,* 235 Mass. 526, 535–536, and we think the prosecution could respond, as it did at its first opportunity on rebuttal, by asking Mrs. H. whether she had in fact received the call. When, however, the prosecution started to go further and asked Mrs. H. what the call was about, it was the defence that objected, despite its prior challenge. In these circumstances the judge in his discretion ruled that the line of examination had gone far enough. The defence thought the reference to fighting and a gun damaging to the defendant, but if the questioning was proper it need not be prettified, and

the implication was in all events weakened by its obscurity. See *Commonwealth* v. *Vanetzian,* 350 Mass. 491, 494–495. There was no error at any point.[5]

Considering the transcript in its entirety, we think the trial was fair.

*Judgments affirmed.*

---

[5] The defendant's argument (and exception No. 24, see *supra* note 4) may be taken as extending also to a question about an alleged call by Mrs. Chalifoux to Mrs. H. after the defendant's arrest pleading with Mrs. H. to give the defendant another chance. Mrs. Chalifoux denied having made the call and the interrogation stopped there. This was merely incidental to considerable testimony in the record about efforts by the defendant's family after his arrest to chill the prosecution of the defendant by placating and quieting Mrs. H. This bore on the credibility of the father and mother as witnesses.