COMMONWEALTH *vs.* FRANK CLIFFORD.

Hampden. March 7, 1977. — January 27, 1978.

Present: HENNESSEY, C.J., BRAUCHER, WILKINS, LIACOS, & ABRAMS, JJ.

*Practice, Criminal,* Directed verdict, Mistrial, Charge to jury. *Evidence,* Other offense, Collateral matter, On cross-examination, Photograph, Judicial discretion. *Witness,* Impeachment. *Identification. Constitutional Law,* Assistance of counsel. *Homicide.*

Even though the testimony of two witnesses at the trial of indictments for murder and arson was confusing and uncertain there was sufficient evidence to warrant a finding of guilty. [296-297]

The fact that a prosecution witness in a criminal case alluded to unrelated criminal conduct by the defendant did not require a mistrial where the judge immediately instructed the jury to disregard the remark and defense counsel sought no additional cautionary instructions as part of the judge's charge. [297-299]

Where a defendant charged with arson and murder testified that he was not in possession of gasoline on the day preceding the fire, there was no error in admitting, for the purpose of impeaching the defendant's testimony, evidence that he had been carrying gasoline in an orange soda bottle the day before the fire. [299-300]

A criminal defendant who was permitted to consult with an attorney for only a very brief time during a pre-trial lineup was not denied his Sixth Amendment rights where neither a criminal complaint, an indictment, nor other formal charge had been issued against the defendant [300-302]; nor was he denied due process of law by the fact that he was the only individual in the lineup with a blue jacket, especially where

the identifying witnesses knew the defendant for some time prior to the crime [303-304].

At a criminal trial a judge did not abuse his discretion in refusing to allow the defendant to cross-examine a witness as to whether she was scheduled to go to court on a charge involving unlawful possession of a gun. [305]

At a murder trial, there was no error in the admission of photographs of the deceased's body. [305-306]

At a murder trial, evidence that the defendant had poured gasoline on the deceased and set him on fire and that as a result the deceased had leapt from a fifth floor window to his death warranted submission to the jury of the issue whether the decedent had been killed with extreme atrocity or cruelty. [306-308]

INDICTMENTS found and returned in the Superior Court on June 5, 1974.

The cases were tried before *Moriarty*, J.

*John F. Donahue* for the defendant.

*L. Jeffrey Meehan,* Assistant District Attorney, for the Commonwealth.

LIACOS, J. The defendant was tried and found guilty by a jury on two indictments, one charging that he wilfully and maliciously set fire to the Mayflower Hotel in Springfield, and the other charging him with murder in the first degree of one Robert Stokes. On September 21, 1974, the judge sentenced the defendant to imprisonment for life on the indictment for murder in the first degree and fifteen to twenty years on the indictment for arson; he ordered the sentences to be served concurrently at the Massachusetts Correctional Institution at Walpole.

On appeal to this court, the defendant raises seven issues with respect to alleged errors of the trial judge in (1) denying the defendant's motion for a directed verdict, (2) denying the defendant's motion for a mistrial based on statements made by the witness Marilyn Olmstead, (3) admitting the testimony of the witness Robert James, (4) admitting evidence of in-court and out-of-court identifications of the defendant, (5) restricting the cross-examination of Marilyn Olmstead, (6) admitting in evidence certain photographs of the deceased, and (7) refusing to instruct the jury that this

case was not a murder committed with extreme atrocity or cruelty.

We hold that there was no reversible error. We find no basis to modify the jury verdict under G. L. c. 278, § 33E.

We summarize the evidence in its aspect most favorable to the Commonwealth. *Commonwealth* v. *Klein,* 372 Mass. 823, 824 (1977). Both the defendant and Stokes were residents of the Mayflower Hotel in Springfield. They occupied adjoining rooms on the fifth floor. In the early morning of April 7, 1974, the defendant and Stokes quarreled in the corridor outside Stokes's room. During this argument Stokes warned the defendant, "If I catch you in my room again again, I'll kill you." The defendant responded to this threat by saying: "M. F., you ain't going to be doing nothing to me." There was a physical altercation between the two men which was broken up by other persons, including the night manager of the hotel. The night manager then asked the defendant to vacate his room and leave the hotel. This incident occurred approximately at 1:30 A.M. The defendant left the premises shortly thereafter. There was evidence that subsequently at a nearby automobile garage a man wearing a hat, bluish jacket, and dark pants — clothing similar to that worn by the defendant — purchased gasoline in a can between 2 and 3 A.M.

About 3 A.M. a fire broke out in the deceased's room. Expert testimony was to the effect that the cause of the fire was by "human design." The Commonwealth presented several witnesses linking the defendant to this crime. Marilyn Olmstead, occupant of the room next to the deceased's room, testified that at approximately 3 A.M. she opened her door after detecting the odor of gasoline and saw the defendant in dark pants and a blue jacket outside her door. One Robert Shumate testified he heard the victim in his room "screaming" and "hollering" that he was burning. The screams were described as "ungodly." Linda Washington, who occupied a room two doors from the deceased, testified that after noticing the fire she opened her door and saw the defendant standing in the hallway holding a can in

his hand. She then fled the hotel, crossed the street, and observed the deceased jump from his fifth floor window and fall forty-five to fifty feet to the street below.

Shortly thereafter the police found the deceased in the alley by the rear of the hotel. His hair smelled of gasoline. An autopsy later revealed that the victim died from a broken neck, other multiple fractures, and lacerations of the lung, liver, and spleen. The body had extensive second and third degree burns of the back and neck and on all four extremities. There was evidence that the victim was still alive when he fell to the street but died almost immediately thereafter. At approximately 5:15 A.M. on the morning of the fire the defendant was arrested wearing a hat, blue jacket, and dark pants. His hands had the odor of gasoline.

The defendant took the stand in his own behalf and also presented several witnesses to establish an alibi defense.

1. *Directed Verdict.*

The defendant contends that the judge erred in denying the defendant's motions for directed verdicts at the close of the prosecution's case and at the close of all the evidence. The issue raised by a motion for a directed verdict is "whether there was sufficient evidence of the defendant's guilt to warrant the submission of the [case] to a jury." *Commonwealth* v. *Baron*, 356 Mass. 362, 365 (1969), quoting from *Commonwealth* v. *Altenhaus*, 371 Mass. 270, 271 (1944). The appellate standard of review is whether the evidence, read in a light most favorable to the Commonwealth, *Commonwealth* v. *Flynn*, 362 Mass. 455, 479 (1972), is sufficient so that the jury "might properly draw inferences, not too remote in the ordinary course of events, or forbidden by any rule of law, and conclude upon all the established circumstances and warranted inferences that the guilt of the defendant was proved beyond a reasonable doubt." *Commonwealth* v. *Vellucci*, 284 Mass. 443, 445 (1933). *Commonwealth* v. *Gallagher*, 4 Mass. App. Ct. 661, 662 (1976).

From the evidence as summarized above, the jury properly could have found the defendant guilty of the crime of

arson and the crime of murder in the first degree, either be-
cause committed with deliberately premediated malice
aforethought or with extreme atrocity or cruelty. The de-
fendant contends that his alibi defense is as plausible as the
confusing and uncertain testimony of the Commonwealth's
two principal witnesses, Olmstead and Washington, who
placed the defendant in the hall at the time of the fire. But it
was for the jury and not the judge to determine whether the
defendant's explanations should be believed. *Common-
wealth* v. *Vellucci, supra* at 446.

The defendant erroneously relies on *Commonwealth* v.
*Croft,* 345 Mass. 143, 145 (1962), where this court stated:
"When the evidence tends equally to sustain either of two
inconsistent propositions, neither of them can be said to
have been established by legitimate proof."

This is not a case, however, in which the guilt of the de-
fendant has no solid foundation in fact, as happened in
*Croft.* In *Croft,* the inference that the defendant held
heroin with the intent to sell was no more compelling than
the inference that he retained it until he was certain he had
defeated his drug habit. *Id.* at 144-145. See *Commonwealth*
v. *Fancy,* 349 Mass. 196, 200 (1965) (defendant's mere
presence in the apartment where stolen liquor was found
was insufficient to convict him of stealing liquor); *Com-
monwealth* v. *Altenhaus, supra* at 273-274 (evidence on
issue of the defendant's knowledge of use of hotel for im-
moral purposes was as consistent with innocence as with his
guilt). Here, the prosecution's evidence strongly supported
the inference that the defendant committed arson and
murder. While the jury could have disbelieved the testi-
mony of Olmstead and Washington and that of the other
prosecution witnesses they were not required to do so. The
judge properly denied the defendant's motions for a direc-
ted verdict.

2. *Motion for Mistrial.*

Under the fourth assignment of error, the defendant
argues that the judge committed reversible error by denying
the defendant's motion for a mistrial based on the testimony

of Marilyn Olmstead. During direct examination, Olmstead alluded to the defendant's involvement in a robbery.[1]

Ordinarily, evidence of other crimes and prior misconduct of which the defendant might be guilty may not be received. *Commonwealth* v. *Nassar*, 351 Mass. 37, 42-43 (1966), appeal after remand, 354 Mass. 249 (1968), cert. denied, 393 U.S. 1039 (1969). *Commonwealth* v. *Welcome*, 348 Mass. 68, 70 (1964). *Commonwealth* v. *Banuchi*, 335 Mass. 649, 654 (1957). *Commonwealth* v. *Ellis*, 321 Mass. 669, 670 (1947). *Commonwealth* v. *Stone*, 321 Mass. 471, 473 (1947). *Commonwealth* v. *Green*, 302 Mass. 547, 552 (1939). W.B. Leach & P.J. Liacos, Massachusetts Evidence 122-123 (4th ed. 1967). This rule stems from the belief that such evidence forces the defendant to answer accusations not set forth in the indictment, confuses his defense, diverts the attention of the jury, and may create undue prejudice against him. *Commonwealth* v. *Jackson*, 132 Mass. 16, 20-21 (1882).

The harmful effects of such evidence, however, can be offset by a judge's careful warning to the jury. Here the improper and nonresponsive answer by the witness was immediately cured by the judge's instruction that the jury disregard the witness's remark.[2] This court adheres to a practical view which does "not assume that jurors will slight strong and precise instructions of the trial judge to disregard the matters which have been withdrawn from their consideration." *Commonwealth* v. *Gordon*, 356 Mass. 598, 604

---

[1] The following dialogue between Olmstead and the attorney for the Commonwealth occurred: "Q. You had words with who? A. Clifford [the defendant]. Q. And could you tell the Court and jury what those words were? A. Well, we had a robbery in our place in the men's room, and I told him that I could identify him, and I couldn't turn my back any more."

[2] The judge clearly and forcefully cautioned the jury: "Now, Mr. Foreman and ladies and gentlemen of the jury, I'm going to ask you to completely disregard the last statement that was made by the witness. It was made inadvertently on her part, but nevertheless, I want you to completely disregard that. Put it right out of your minds. It has absolutely nothing to do with this case."

(1970). See *Commonwealth* v. *Stone*, 366 Mass. 506, 513 (1974).

Where we have held that the judge's instructions did not cure the error, other factors were present. Compare *Commonwealth* v. *Banuchi, supra* at 654 (although giving cautionary instructions, the judge left the same prejudicial evidence in later during cross-examination), and *Commonwealth* v. *Kosior*, 280 Mass. 418, 423 (1932) (error not cured by charge since the judge said jury might consider evidence "for what it is worth"), with *Commonwealth* v. *A Juvenile*, 365 Mass. 421, 438-439 (1974) (error in nonresponsive remark regarding the defendant's prior abuse of murder victim corrected by the judge's instruction).

The defendant cites two cases to support his argument that no curative instruction could remove the harmful effects of the witness's statement. Both these cases are inapposite. In *Commonwealth* v. *Vanderpool*, 367 Mass. 743, 748 (1975), this court said that it is desirable for the judge to give cautionary instructions when there is a real possibility that the jury in their deliberations may consider that which is not properly in evidence. Such instructions were given. In *Bruton* v. *United States*, 391 U.S. 123, 137 (1968), cautionary instructions were held to be ineffective in remedying a violation of the defendant's Sixth Amendment rights. No constitutional violation is involved here.

We note also that the defendant's counsel sought no additional cautionary instructions to the jury on this matter as part of the judge's charge. The failure to make such request seems explained by defense counsel's decision to explore this matter further with the same witness on cross-examination and then to argue the matter to the jury as illustrative of Olmstead's bias against the defendant. The defendant cannot have it both ways. The judge did not abuse his discretion in denying the defendant's motion for a mistrial.

3. *Impeachment Testimony.*

The defendant argues that the testimony of the witness Robert James for the Commonwealth was so inflammatory as to outweigh its impeachment value. The defendant had

testified previously under cross-examination that he was not in the possession of gasoline on the day preceding the fire. In rebuttal, the Commonwealth called James who stated that the defendant, while carrying an orange soda bottle containing gasoline, had stopped in James's room the day before the fire.

In essence, the defendant is contending that the judge abused his discretion by admitting this testimony in evidence. The only case the defendant cites in support of his argument is *Commonwealth* v. *Chalifoux*, 362 Mass. 811, 816 (1973), in which this court stated that an argument could be made for excluding a statement whose probative force appeared to be substantially outweighed by the danger of prejudice. In *Chalifoux*, however, the court affirmed the defendant's conviction despite a witness's reference to the defendant's being in jail.

Carrying a soda pop bottle filled with gasoline is not in itself a wrongful act. The judge properly advised the jury that the evidence was admitted for the limited purpose of contradicting the defendant's testimony that he did not have possession of gasoline on the day prior to the day of the crime. Extrinsic evidence on a collateral matter may be introduced at trial for the purposes of impeachment in the sound discretion of the judge. *Commonwealth* v. *Chase*, 372 Mass. 736, 747 (1977). *Commonwealth* v. *Doherty*, 353 Mass. 197, 213-214 (1967), cert. denied, 390 U.S. 982 (1968). There was no error.

*4. Identification Evidence.*

Under assignments of error 1, 3, and 6, the defendant alleges that the police conduct during a pre-trial lineup violated his right to counsel and due process of law. The judge made the following findings in ruling on the defendant's motion to suppress any in-custody or in-court identification evidence.

On the morning of the fire, at approximately 5:15 A.M., the Springfield police arrested the defendant at the Amtrak railroad station in Springfield. The defendant was taken to the police station where arrangements were made for a

lineup. The defendant was given the Miranda warnings and advised of his right to use a telephone. The defendant then requested representation by an attorney. Between 6:30 and 7 A.M., the police called Mr. Edward F. McBride, head of the Springfield office of the Massachusetts Defenders Committee, and asked him to assist the defendant during the lineup. Mr. McBride agreed to appear, but stated that, since the defendant was charged with murder in the first degree, he (Mr. McBride) would not be the attorney at trial; hence he protested the holding of any lineup procedures until after the defendant had been arraigned and trial counsel appointed. He, nevertheless, proceeded to the police station to consult with the defendant.

Prior to Mr. McBride's arrival at the police station, the police placed the defendant in a lineup with four other black males of similar height, age, and build. Two of them were police officers, and two were suspects under arrest. Except for a brown fur-lined hat, the defendant had on the same clothes he had worn for the past twenty-four hours: a short blue jacket, black pants, white T-shirt, and black leather shoes with a red suede instep. Two other lineup participants wore white T-shirts; three wore dark pants, including the police officers in their dark uniform pants with a blue stripe down the legs; and one of the participants wore an Army jacket.

The lineup was conducted through a one-way mirror. The first potential witness to view the lineup, the gasoline attendant, could not identify the defendant. Mr. McBride then arrived at the station and met with the defendant who was called from the lineup room. The attorney-client consultation lasted only about thirty seconds because the police officers in charge wished to proceed with the lineup.

Marilyn Olmstead and Linda Washington, residents of the Mayflower Hotel, and Tyrone Barnett, manager of the hotel, then viewed the lineup and identified the defendant. They all previously knew him.

At the defendant's trial, Olmstead identified the defendant in court and testified as to her out-of-court identifica-

tion. Washington also identified the defendant in court, but did not testify as to her out-of-court identification of him. A photograph of the lineup was later offered and admitted in evidence on the ground that it represented the appearance of the defendant on the day of the crime.

The defendant contends that his Sixth Amendment rights were violated when the police prevented his attorney from adequately assisting him during the lineup. He argues that the abbreviated conference which the police allowed the defendant and his attorney violated the principle set forth in *Powell* v. *Alabama,* 287 U.S. 45, 59 (1932), and *Avery* v. *Alabama,* 308 U.S. 444, 446 (1940). In both these cases, the Supreme Court recognized that effective assistance of counsel at trial is denied when counsel is not given adequate opportunity to prepare the defense. While conceding that there was no constitutional obligation to provide counsel at a pre-indictment lineup, the defendant makes the bare assertion that once counsel was provided the police were obligated to conform to the teaching of *Powell* and *Avery, supra.*

*Kirby* v. *Illinois,* 406 U.S. 682, 689-690 (1972), governs this case. See *Commonwealth* v. *Stewart,* 365 Mass. 99, 101-102 (1974); *Commonwealth* v. *Stanley,* 363 Mass. 102, 104 (1973). The per se rule of exclusion of identification evidence when counsel is absent from the lineup proceeding is inapplicable where the defendant has been arrested but neither a criminal complaint, an indictment, nor other formal charge has been issued against the defendant. *Commonwealth* v. *Kudish,* 362 Mass. 627 (1972). *Commonwealth* v. *Lopes,* 362 Mass. 448, 451 (1972). See also *Flaherty* v. *Vinzant,* 386 F. Supp. 1170, 1172 (D. Mass. 1974).

Although the police did not exceed the constitutional bounds by providing only a short period for the defendant and his attorney to confer, we agree with the judge in these circumstances that the better practice would have been to give the attorney a more meaningful opportunity to become acquainted with the case and the prospective witnesses, even if this delayed the lineup a while longer. Because

counsel is not constitutionally required at this stage of the criminal process, however, we find no reversible error in the extremely brief consultation allowed the defendant and his attorney.

The defendant also contends that the police conducted the in-custody lineup in a manner unnecessarily suggestive and conducive to irreparable mistaken identification, thus denying him due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. The defendant argues that because he was the only individual in the lineup with a blue jacket, the same clothing he wore when the witnesses Olmstead and Washington saw him on the evening of the fire, a suggestive element was improperly added to the identification procedure. Thus, according to the defendant, it was all but inevitable that he would be singled out by the witnesses.[3]

When a pre-indictment lineup is conducted in a manner so impermissibly suggestive as to give rise to a substantial likelihood of irreparable mistaken identification, due process is denied. *Kirby* v. *Illinois, supra* at 690-691. *Stovall* v. *Denno,* 338 U.S. 293, 309-312 (1967). *Commonwealth* v. *Lopes, supra* at 451-454. In deciding whether a lineup was unnecessarily suggestive, the judge is to consider the totality of the circumstances surrounding it. It is for the defendant to establish by a preponderance of the evidence that impermissibly suggestive procedures were employed at the lineup. *Commonwealth* v. *Botelho,* 369 Mass. 860, 866 (1976).

The judge, after hearing testimony with respect to the lineup procedures, found no evidence that any improper

---

[3] The defendant does not contest the use of a one-way mirror at the lineup. This court has not found its use unconstitutional. *Commonwealth* v. *Lopes,* 362 Mass. 448 (1972). But see *Allen* v. *Moore,* 453 F.2d 970, 974 (1st cir.), cert. denied, 406 U.S. 969 (1972). The defendant also does not criticize the fact that two lineup participants wore police uniform pants. This fact in itself would probably not result in a denial of due process. See *Commonwealth* v. *Wilson,* 357 Mass. 49, 54, cert. denied, 400 U.S. 823 (1970) (no due process denial despite lineup with nine men, three of whom were policemen known to the eyewitnesses).

suggestion had been made to the witnesses and found that the lineup was fairly conducted. If the judge's careful findings regarding the identification of the defendant are supported by the evidence, we are not likely to disturb them. *Commonwealth* v. *DeBrosky,* 363 Mass. 718, 726 (1973). *Commonwealth* v. *Murphy,* 362 Mass. 542, 547 (1972). We believe that the defendant's wearing apparel is a factor to consider in determining the fairness of the confrontation but it is not dispositive, especially here since the defendant does not contend that he was forced to don this jacket. The judge, being in a superior position to observe and weigh the testimony, could well have concluded that, in light of the over-all makeup of the lineup, the defendant would not be impermissibly singled out for wearing a jacket similar to the one used during the crime. Cf. *Commonwealth* v. *Mobley,* 369 Mass. 892, 896 (1976). Furthermore, the judge's conclusion was bolstered by his finding that the danger of misidentification was substantially lessened because the identifying witnesses personally knew the defendant for some time prior to the crime.[4] See *Commonwealth* v. *Ferguson,* 365 Mass. 1, 7 (1974); *Commonwealth* v. *Leaster,* 362 Mass. 407, 414 (1972); *United States* v. *Wade,* 388 U.S. 218, 241 n.33 (1967).

The defendant also contends that the judge should have excluded the in-court identification of the defendant by the two witnesses. Since the judge properly found that the pretrial lineup was conducted fairly, no taint attached to these in-court identifications, and they were thus rightly admitted. *Commonwealth* v. *Dickerson,* 372 Mass. 783, 791 (1977). *Commonwealth* v. *Roberts,* 362 Mass. 357, 366 (1972). There was no error in the denial of the motion to suppress identification evidence.

---

[4] The facts of this case do not require us to decide whether to allow the admission of evidence of an unnecessarily suggestive confrontation if other indicia of reliability exist, such as the witnesses' prior knowledge of the defendant. Compare *Manson* v. *Brathwaite,* 432 U.S. 98 (1977), with *Commonwealth* v. *Botelho,* 369 Mass. 860 (1976).

5. *Restriction of Cross-examination.*

Under the fifth assignment of error, the defendant contends that the judge abused his discretion in restricting the cross-examination of Marilyn Olmstead. The defendant wanted to ask the witness whether she ever carried a gun and to bring out the fact that she was scheduled to go to court on a charge involving unlawful possession of a gun.

The right of cross-examination is "an essential and fundamental requirement for . . . [a] fair trial . . . ." *Pointer* v. *Texas*, 380 U.S. 400, 405 (1965). See also *Commonwealth* v. *Johnson*, 365 Mass. 534, 543 (1974), and cases cited therein. This right to cross-examination, however, is not absolute, but must be accommodated to other legitimate interests. *Commonwealth* v. *Turner*, 371 Mass. 803 (1977). Here, the judge correctly limited cross-examination. Evidence of prior bad conduct may not be used to impeach a witness's credibility except by production of records of criminal convictions pursuant to G. L. c. 233, § 21. *Commonwealth* v. *Turner, supra* at 809-810. *Commonwealth* v. *Binkiewicz,* 342 Mass. 740, 755 (1961). *Commonwealth* v. *Dominico,* 1 Mass. App. Ct. 693, 713 (1974). W.B. Leach & P.J. Liacos, Massachusetts Evidence at 123.

Furthermore, Olmstead's possession of a gun was irrelevant to the issue on trial. The judge had the discretionary powers to limit such examination. *Commonwealth* v. *Turner, supra* at 811. *Commonwealth* v. *Nassar*, 351 Mass. at 43-44.

6. *Photographs of the Deceased.*

The defendant contends that the judge abused his discretion by admitting in evidence three allegedly inflammatory photographs of the deceased's body taken the day of his death. The defendant does not take issue with the authentication of the photographs, but argues that the prejudicial effect far outweighs the minimal probative value of the photographs. In proving that the presiding judge abused his discretion by admitting in evidence inflammatory photographs, the defendant carries a heavy burden. Compare

*Commonwealth* v. *Bys*, 370 Mass. 350, 361 (1976), with *Commonwealth* v. *Richmond*, 371 Mass. 563 (1976).

It is well settled that photographs of the deceased have probative worth and may be admitted to show the jury the nature of the injuries inflicted. *Commonwealth* v. *Galvin*, 323 Mass. 205, 215 (1948), and cases cited therein. Here the photographs graphically portrayed to the jury the gruesome nature of the crime. Thus, they were relevant to the issue of extreme atrocity and cruelty as a possible ground for conviction of murder in the first degree. This court has repeatedly held that such photographs may be properly admitted on the issue of "extreme atrocity or cruelty." See, e.g., *Commonwealth* v. *Bys, supra* at 358; *Commonwealth* v. *Simpson*, 370 Mass. 119, 126 (1976); *Commonwealth* v. *Rogers*, 351 Mass. 522, 531, cert. denied, 389 U.S. 991 (1967); *Commonwealth* v. *Sheppard*, 313 Mass. 590, cert. denied, 320 U.S. 213 (1943); *Commonwealth* v. *Osman*, 284 Mass. 421, 423 (1933); *Commonwealth* v. *Knowlton*, 265 Mass. 382, 385-386 (1928).

The defendant contends that, even if relevant to the issue of atrocity or cruelty, these photographs were unnecessary since the jury could comprehend the extent of the injuries from the detailed testimony of the expert medical witness. In *Commonwealth* v. *Bys, supra* at 359, this court stressed that it had "invariably rejected" the argument that oral testimony adequately describing the victim made the introduction of photographs unnecessary. See, e.g., *Commonwealth* v. *Chalifoux*, 362 Mass. at 817.

In light of the relevance and authenticity of these photographs, we cannot say that the judge abused his discretion. See *Commonwealth* v. *D'Agostino*, 344 Mass. 276, 279 (1962).

7. *Charge to the Jury.*

The defendant finally argues under the tenth and eleventh assignments of error, raised by exceptions 24 and 25, that the judged erred in refusing to instruct the jury that this case was not a murder committed with extreme atrocity or cruelty.

To submit the issue of atrocity or cruelty to the jury, the evidence must tend to show that the murder was committed with an aggravated and extreme degree of atrocity or cruelty. *Commonwealth* v. *Eisen*, 358 Mass. 740, 746 (1971), and cases cited therein. In the following cases this court held that the judge did not err in charging the jury on this question: *Commonwealth* v. *Reddick*, 372 Mass. 460, 461-462 (1977) (victim stabbed eleven times); *Commonwealth* v. *Eisen*, *supra* at 746 (victim died as a result of extensive head wound inflicted by heavy, blunt instrument); *Commonwealth* v. *Knowlton*, *supra* at 385, 389 (victim died from single severe blow on the head); *Commonwealth* v. *Feci*, 235 Mass. 562, 571 (1920) (deceased shot in head three times and stabbed and cut in twenty places); *Commonwealth* v. *Gilbert*, 165 Mass. 45 (1895) (evidence that victim died from single blow with an axe).

On review, this court examines both the defendant's actions, in terms of his method of murder, and the resulting effect on the victim, in terms of the physical injury and pain suffered. *Commonwealth* v. *Lacy*, 371 Mass. 363, 367 (1976). Most cases fall between the extremes of mercy killings and gruesome deaths; if the evidence is sufficient, the judge may submit the question to the jury. As stated in *Commonwealth* v. *Lacy*, *supra* at 367-368: "[I]n the final analysis the issue must be left largely to the deliberation of the jury 'who, as the repository of the community's conscience, can best determine when the mode of inflicting death is so shocking as to amount to extreme atrocity or cruelty.'" *Commonwealth* v. *Connolly*, 356 Mass. 617, 628, cert. denied, 400 U.S. 843 (1970). See also *Commonwealth* v. *Harrison*, 365 Mass. 235, 236-237 (1974).

The defendant alleges that the evidence did not warrant a charge of murder with extreme cruelty since there was insufficient proof that the defendant doused the deceased with gasoline. We think, however, that the Commonwealth presented sufficient circumstantial proof that the deceased had been splashed with gasoline, set on fire, and that as a result of these acts the deceased suffered great pain and was

foreseeably caused to leap through a fifth floor window to his death. Thus, the judge did not err in submitting this issue to the jury.[5]

8. *Chapter 278, § 33E, Review.*

Pursuant to G. L. c. 278, § 33E, we have reviewed the entire record and transcript. We conclude that the verdict was supported by both the law and the evidence. The interests of justice demand neither a new trial nor the entry of a verdict of a lesser degree of guilt.

*Judgments affirmed.*

---

[5] The judge also properly charged, without exception, the jury on premeditation as an alternative basis of finding murder in the first degree.