COMMONWEALTH *vs.* EARL SHOLLEY.

No. 98-P-365.

Norfolk. September 13, 1999. - January 28, 2000.

Present: PERRETTA, GREENBERG, & LENK, JJ.

Further appellate review granted, 431 Mass. 1104 (2000).

*Threatening. Idle and Disorderly Person. Disruption of Court Proceedings. Statute,* Construction. *Evidence,* Cross-examination, Bias, Prior misconduct, Relevancy and materiality, State of mind. *Words,* "Threatened," "Disrupt."

Evidence at the trial of a complaint of threatening to commit a crime, G. L. c. 275, § 2, was sufficient to establish that the defendant's conduct and statements constituted a threat that the defendant had the apparent ability to carry out and that reasonably justified apprehension on the part of the recipient. [496-499]

At the trial of a complaint alleging the defendant was a disorderly person in violation of G. L. c. 272, § 53, evidence of the defendant's loud use of obscenities in a public place, without more, was insufficient to warrant submission of the case to the jury: the defendant's motion for a required finding of not guilty should have been allowed. [499-500]

At the trial of a complaint for violation of G. L. c. 268, § 13C, the evidence failed to establish that the defendant actually disrupted a trial or other court proceedings by his loud outburst in a courthouse corridor and stairwell, and the defendant's motion for a required finding of not guilty should have been allowed. [500-501]

In the circumstances of a prosecution for threats, no substantial likelihood of a miscarriage of justice arose from the prosecutor's cross-examination of the defendant regarding a prior conviction for assault and battery and a pending restraining order against him, where the evidence was relevant to the defendant's state of mind, viz., his bias against the court system at the time he made threatening remarks to a prosecutor. [501-504]

COMPLAINT received and sworn to in the Quincy Division of the District Court Department on June 25, 1996.

The case was tried before *Paul F. X. Moriarty,* J.

*John J. Amendolare* for the defendant.

*Patrick C. Lee,* Special Assistant District Attorney, for the Commonwealth.

GREENBERG, J. In 1996, one Raymond Barrio was charged in

the Quincy Division of the District Court Department of violating a protective order issued pursuant to G. L. c. 209A. The defendant, Earl Sholley, a self-described "father's rights activist" was present in the courtroom during the first day of Barrio's bench trial. On the next day, after Barrio had been found guilty, Sholley came into the courthouse and peeked through the window of the door to the same courtroom. Stationed inside was a court officer, Kirk Parks, who saw Sholley standing just outside in the hallway. Parks asked Sholley if he needed help. After boisterous conversation, more fully described in the margin,[1] Parks decided to remove Sholley from the courthouse building. Sholley was more or less compliant in leaving the courthouse. He was subsequently arrested outside the building.

Sholley was convicted by a jury of six of threatening to commit a crime (G. L. c. 275, § 2), being a disorderly person (G. L. c. 272, § 53), and disrupting court proceedings (G. L. c. 268, § 13C). We deal with Sholley's appeal, in which he complains of the judge's denial of motions for required findings of not guilty and of certain evidentiary rulings.

1. *Threatening to commit a crime.* Sholley argues that his motion for required finding of not guilty on the threatening charge should have been allowed as evidence of both the intention and ability to carry out the threat were insufficient within the meaning of G. L. c. 275, § 2.[2]

An oft-quoted United States District Court decision defines the word "threatened" as it appears in the statute: "It is 'the

[1]Sholley asked about the outcome of the Barrio case. When Parks informed him of Barrio's sentence, the defendant became angry and said, "You mean he was found guilty?" and "You mean to tell me that fuckin' bitch sent him back to jail?" Parks described the defendant as angry and "out of control." Sholley's raised voice drew the attention of some passersby in the hall who stopped to observe. Though Parks asked Sholley to quiet down, he continued to raise his voice, yelling, "She's fucked now!" Sholley continued to make statements about how men are unfairly treated by the courts in domestic violence cases.

[2]General Laws c. 275, § 2, provides:

"If complaint is made to any such court or justice that a person has threatened to commit a crime against the person or property of another, such court or justice shall examine the complainant and any witnesses who may be produced, on oath, reduce the complaint to writing and cause it to be subscribed by the complainant."

expression of an intention to inflict evil, injury, or damage on another.' Webster's New International Dictionary, n.1 (1966 ed. unabridged)." *Robinson* v. *Bradley,* 300 F. Supp. 665, 668 (D. Mass. 1969). Massachusetts courts have referred to this definition approvingly in several cases. See *Commonwealth* v. *Chalifoux,* 362 Mass. 811, 816 (1973); *Commonwealth* v. *Daly,* 12 Mass. App. Ct. 338, 339 n.1 (1981); *Commonwealth* v. *Ditsch,* 19 Mass. App. Ct. 1005 (1985). More than that, the decisional law requires that the threat be made in circumstances that would reasonably justify apprehension on the part of an ordinary person. See *Commonwealth* v. *Corcoran,* 252 Mass. 465, 482-483 (1925); *Commonwealth* v. *Strahan,* 39 Mass. App. Ct. 928, 929 (1995).

Viewed in a light most favorable to the government, without weighing contrary evidence presented by the defense, *Commonwealth* v. *Kelley,* 370 Mass. 147, 150 & n.1 (1976), the findings which the evidence warranted, e.g., Sholley's tantrum about the outcome of the Barrio case and his disquieting remarks about the judge, by themselves, are not sufficient to offend the statute. Sholley's reaction was out of line, but his initial remarks were not directed to anyone in particular. However, other remarks he made on the stairs as he descended to the main exit door of the courthouse were overheard by Courtney Cahill, the prosecutor in the Barrio case. She had heard some shouting on the second floor and headed up the stairs to see what was happening. As Cahill came up the stairs within earshot of Sholley, she heard him yelling, "This is war. There's gonna be blood in the streets, bloodshed in the streets." Within seconds they came abreast of each other on the stairwell. Sholley stopped and pointed his finger at her, saying angrily, "Watch out counselor." Cahill testified that she was "extremely frightened." She quickly ascended the stairs to get away. While Sholley's final warning to Cahill did not itself constitute a threat to commit a specific crime, Cahill testified that several months before this episode, she had received several pieces of mail from an organization styling itself "Father's Rights Coalition." Sholley had authored some of the articles. In these circumstances, the words "watch out counselor," "must be interpreted in the context of the actions and demeanor which accompanied them; when viewed together they may constitute the requisite expression [of intention to do bodily harm], and may indicate additionally, . . . ability and apprehension." *Commonwealth* v. *Elliffe,* 47 Mass.

App. Ct. 580, 582 (1999).[3] Cf. *Commonwealth* v. *Delgado*, 367 Mass. 432, 437 (1975) ("it is well established in this State that an act placing another in reasonable apprehension that force may be used is sufficient for the offense of criminal assault").

The instant case is similar to the *Strahan* case, 39 Mass. App. Ct. 928 (1995), where the defendant, an animal rights activist who regularly picketed the New England Aquarium (Aquarium) in Boston, transgressed the statute by saying to an Aquarium employee, "I am assessing the enemy," and "I'm just looking for, for a place to put a hole in the boat." The Aquarium

---

[3]To illustrate the highly charged atmosphere that prevailed, we reproduce a portion of Cahill's direct testimony on the point.

> PROSECUTOR: "Now approximately how much time elapsed between the time you heard about, 'This is war,' the 'bloodshed in the street' comment, and the time that he stopped you on the stairs?"
>
> CAHILL: "Maybe two, three seconds at most. Only from the time it took him to get from the top to the bottom and he was going at a quick pace."
>
> PROSECUTOR: "What was your demeanor, or what was your reaction when this happened to you on the stairs?"
>
> CAHILL: "Because of my background with Mr. Sholley, I was extremely frightened by him telling me to watch my back."
>
> PROSECUTOR: "Now when you say your 'background with Mr. Sholley,' have you met this Defendant Sholley before?"
>
> CAHILL: "Mr. Sholley is part of a . . . actually at one point, I'm sure . . . I think he was the president of a coalition for the preservation of fatherhoods [*sic*]. It's a group that . . . of gentlemen that have gotten together. They've picketed the Courthouse many times. Mr. Sholley used to send mail to the . . . his state reps, to the legislature, and he used to send me a copy of it — At his plight that all men in domestic violence situations are mistreated in the Court; that men are not treated equally; and he used to picket the Courthouse with this group. They've held . . . they've been in front of the Courthouse several times trying to hand out flyers to people who are entering the Courts, and the Defendant that I had just tried, the case against Raymond Barrio, at one point he was the focus of one of their . . . their picketing the Courthouses. There were signs that were, 'Free Raymond Barrio,' that 'This is a Kangaroo Court,' 'Men can get no justice in this Court.' And it was . . . the picketing was targeted towards me and another district attorney who were the only ones handling domestic violence prosecutions in Quincy District Court at the time. During the trial of Raymond Barrio, the whole day before, Mr. Sholley sat in the Courtroom and took notes during the whole trial. He just didn't make it there in the morning for sentencing before this happened."

employee took the defendant's remarks as a threat to sink a whale-watching vessel which was docked nearby. The employee was familiar with the defendant's history at the Aquarium. That was sufficient to get the case to the jury.

In the case before us, as in *Strahan*, Sholley's intention to bully Cahill may be inferred from his past history with the Quincy court, his presence in the courtroom during the Barrio trial, as well as his menacing gesture. As to his ability to carry out the threat, it is true that at the time he addressed her, he was being followed by Parks. There were other persons in the courthouse hallway to keep her from harm's way. Yet these circumstances did not mean that Sholley could not have carried out his threat at a later time. Cahill was justifiably apprehensive that he might do so. See *Commonwealth* v. *Ditsch*, 19 Mass. App. Ct. 1005 (1985) (a threatening letter from a prisoner may give rise to justifiable fear that threat will be implemented even though the prisoner lacked immediate ability to harm the recipient).

2. *Disorderly person.* The provision in G. L. c. 272, § 53, as amended through St. 1973, c. 1073, § 20, for the punishment of "idle and disorderly persons," as construed in *Alegata* v. *Commonwealth*, 353 Mass. 287, 304 (1967), encompasses one who "engages in fighting or threatening, or in violent or tumultuous behavior," or who "creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor." *Commonwealth* v. *A Juvenile*, 368 Mass. 580, 587-595 (1975). See *Chaplinsky* v. *New Hampshire*, 315 U.S. 568 (1942). In other words, the Commonwealth must "prove that the defendant's conduct served no legitimate purpose when it claims that the defendant created a hazardous or offensive condition." *Commonwealth* v. *Sinai*, 47 Mass. App. Ct. 544, 548 (1999). Contrast *Commonwealth* v. *Zettel*, 46 Mass. App. Ct. 471, 475-476 (1999).

Unlike the situation in those cases, here there was no fighting behavior or struggle or other evidence that the defendant acted without legitimate purpose. When Sholley was first observed by the court officer, he made no threat to use force or violence. His clarion call for "war" against the judicial system was not objectively possible of immediate execution. Then came his scornful epithets against the judge: "You mean that . . . fuckin' bitch sent him back to jail?" Words alone, however, including vulgar, profane and offensive speech, do not constitute conduct

cognizable as disorderly conduct, see *Commonwealth* v. *Richards*, 369 Mass. 443, 446 n.2 (1976), and the mere use of obscenities in a public place does not make out the crime of disorderly conduct. *Commonwealth* v. *A Juvenile*, 368 Mass. at 583. Finally, Sholley's exit from the courthouse to the street was voluntary, and at the time of his arrest, he was simply handing out literature a few blocks away. This was a legitimate exercise of his rights under the First Amendment to the United States Constitution. He was warned only after his departure from the courthouse that his continued picketing would result in an arrest for disorderly conduct. These circumstances do not place his conduct within the reach of the statute. Compare *Commonwealth* v. *A Juvenile*, 368 Mass. at 583, where the defendant created a disturbance by screaming opprobrious epithets at a saleswoman in a retail store, causing other employees and shoppers to gather. The court held that "convictions may no longer be constitutionally obtained under § 53 for the offense . . . in circumstances where the offensive and abusive language is relied on as proof of the offense." The court added that the "First and Fourteenth Amendments must be taken to disable the States from punishing public utterances of . . . unseemly expletive[s] in order to maintain . . . a suitable level of discourse within the body politic." *Id.* at 589-590, quoting from *Cohen* v. *California*, 403 U.S. 15, 23 (1971). The quoted phrases apply to this case because Sholley's angry protests both inside and outside of the courthouse had not threatened a breach of the peace. This is apparent from the testimony of the arresting officer, Barbara Di-Natale, who testified that her reason for arresting Sholley for disorderly conduct was "[t]he yelling . . . plus the words that he was using." In short, Sholley's conduct did not fall within the ambit of the statute.[4]

3. *Disruption of court proceeding.* The defendant argues that to convict him under G. L. c. 268, § 13C, the government had to prove that he disrupted a hearing or a trial actually in progress. The statute uses language that gives comfort to that

---

[4]We recognize that conduct incident to protected expression is not insulated from prosecution if the conduct itself involves physical force or violence so as to constitute a public nuisance. By way of illustration of the government's heavy burden in such cases, see *Commonwealth* v. *Feigenbaum*, 404 Mass. 471, 475 (1989), where a protester's blocking of a tow truck and disregarding a police officer's warnings to move away from a government facility did not amount to a violation of the statute because the conduct served some legitimate purpose.

interpretation: "Whoever causes or actively participates in the willful disruption of *proceedings of any court* . . . may be punished" (emphasis added). "When a statute does not define its words we give them their usual and accepted meanings, as long as these meanings are consistent with the statutory purpose." *Building Inspector of Mansfield* v. *Curvin*, 22 Mass. App. Ct. 401, 402 (1986) (citations omitted). Disrupt is defined as "to throw into disorder or turmoil; . . . to interrupt to the extent of stopping, preventing normal continuance of, or destroying." Webster's Third New Intl. Dictionary 656 (1993).

A case construing G. L. c. 272, § 40 — an analogous school disruption statute — provides assistance in interpreting the disrupting court proceedings statute.[5] *Commonwealth* v. *Bohmer*, 374 Mass. 368, 372 (1978), speaks of "such activity as actually creates an interruption or disturbance of the normal functioning of a school."

Here, the government's proof failed to establish the disruption of a trial or other proceedings going on in the courtroom when the defendant began his outburst in the corridor. Cahill, who was downstairs, stated only that she went to investigate the source of some yelling on the second floor. Nor was there any evidence that the commotion in the hallway was any different than the hurly-burly that characterizes any busy District Court. The remainder of the evidence on the point was that several unnamed persons may have paused momentarily in the hallway as Sholley was ushered out of the building. There was no evidence of an actual disruption or interruption of any court proceedings.

4. *Evidentiary matters.* Sholley testified that he was part of a group of activists who claim that the courts and a powerful network of domestic violence agencies are biased against them. Several weeks before the Barrio trial, he had organized a protest demonstration outside the Quincy courthouse to "stop the witch hunt." Literature was disseminated and a number of sympathetic speakers voiced similar sentiments. The Patriot Ledger newspaper published a report on the gathering complete with a picture of a protester clad in a judge's robe. Sholley had written articles on the subject and held strong opinions about perceived injustices against men accused of domestic violence at the Quincy District Court. He ended his direct testimony by deny-

---

[5]General Laws c. 272, § 40, reads as follows: "Whoever wilfully interrupts or disturbs a school or other assembly of people met for a lawful purpose shall be punished . . . ."

ing any intention to threaten Cahill and tried to persuade the jury that all the government's witnesses were mistaken about what he actually said to her in the hallway.

During cross-examination, the prosecutor probed Sholley's knowledge of the details of the Barrio case. She asked if he knew what had happened to Barrio's son. Sholley answered, "there are parents today going to jail . . . for merely disciplining their children, even if it's a slap on the face." Without objection, the prosecutor then put the following question, "In fact, you're one . . . of those people, aren't you, sir? You were convicted, were you not, in 1994, out of the Framingham District Court, of assault and battery. That correct?" Sholley answered, "I'm not sure what this has to do with the proceedings, your Honor." The judge instructed Sholley to answer. He replied, "Yes. That is correct." The prosecutor followed with: "And you're the same person that has restraining orders on you from your ex-wife and your daughter as well, correct?" There followed Sholley's response that no current restraining order was in effect with respect to his wife, but only as to his daughter. The purpose of both questions (there had been no voir dire) was to suggest that Sholley was probably harboring a grudge against the government and, therefore, ought not to be credited.

Ordinarily, a defendant (if he elects to testify) or a defense witness may not be cross-examined about an unrelated arrest, indictment, or pendency of charges in some other forum. *Commonwealth* v. *Bishop*, 296 Mass. 459, 461-462 (1937). *Commonwealth* v. *Haywood*, 377 Mass. 755, 759-761 (1979). There is, nevertheless, some room for the exercise of judicial discretion in the event of such questions, as for example, where the proffered cross-examination evokes particularized information concerning bias of the witness. The rationale for that distinction and collected decisional law illustrating this exception appear in *Commonwealth* v. *Smith*, 26 Mass. App. Ct. 673, 676-679 (1988), and cases cited. See *Commonwealth* v. *Liberty*, 27 Mass. App. Ct. 1, 7 (1989). In those cases in which courts have permitted questioning about pending charges or convictions to show bias on the part of the witness, "there has generally been a link between the witness's entanglement with law enforcement and the main case on trial." *Commonwealth* v. *Smith*, 26 Mass. App. Ct. at 676-677.

Here defense counsel did not object to the prosecutor's questions concerning the defendant's prior conviction or the fact that

a 209A restraining order had issued against him in another case. The prosecutor's questions fairly probed the likelihood that the defendant harbored a bias against the government because he, himself, had been involved in a domestic violence episode similar to the case which he was monitoring the morning of his outburst at the courthouse. Moreover, there was a serious issue at trial concerning his intent, as his testimony concerning what he said to Cahill stood in stark contrast to her version. Although Sholley himself questioned the relevance of these matters before the judge ordered him to respond, defense counsel may have been warranted in concluding that an objection would have been to no avail, and indeed, might have lent additional weight to the testimony. See *Commonwealth* v. *Palmarin*, 378 Mass. 474, 477 (1979).

Given the context in which the questions arose, viz., Sholley's protest that Barrio was unjustifiably convicted for conduct that amounted to legitimate discipline of his child, the two questions put by the prosecutor concerning Sholley's own situation were relevant. "When a possibility of bias exists, however, even if remote, the evidence is for the jury to hear and evaluate." *Commonwealth* v. *Henson*, 394 Mass. 584, 587 (1985). The prosecutor's questions were carefully couched to elicit responses from which the jury might conclude that the outburst on the stairwell was prompted by an antigovernment conspiratorial animus.

Finally, "[e]ven where evidence is relevant, there must be a determination whether its probative value is outweighed by the unfairly prejudicial effect it might have on [the fact finder]." *Commonwealth* v. *LaSota*, 29 Mass. App. Ct. 15, 24 (1990). On this account, the question is close. Surely, with respect to bias, the proffered evidence added something significant concerning the confrontation between Cahill and the defendant. In similar circumstances, inquiry about the accused's prior conviction for violation of a G. L. c. 209A order three months prior to his trial for a similar crime was permitted in *Commonwealth* v. *Chartier*, 43 Mass. App. Ct. 758, 760-761 (1997). On the other hand, the evidence might well have led the jury to discount the defendant's testimony, not on the ground of bias, but on the basis that his entanglements with the law were prior bad acts that demonstrated his lack of character and consequent unreliability as a witness. Impeachment of a witness in that manner is improper.

*Commonwealth* v. *Clifford*, 374 Mass. 293, 305 (1978). *Commonwealth* v. *Smith*, 26 Mass. App. Ct. at 677-678, reminds us that "[q]uestions to a defense witness about other charges on a theory that the existence of such charges might provoke a general anti-government bias appear to have been tolerated in only one case which has come to our attention, *United States* v. *Bagaric*, 706 F.2d 42, 68 (2d Cir.), cert. denied, 464 U.S. 840 (1983) (defense witness was asked about her brother's prosecution for air piracy)," but where the connection between the conviction and other charges bears directly on the defendant's state of mind, we cannot say that the questions gave rise to a substantial risk of a miscarriage of justice.

The judgments on the convictions for being a disorderly person and disrupting court proceedings are reversed and judgments are to enter for the defendant. The judgment on the conviction for threatening to commit a crime is affirmed.

*So ordered.*