# COMMONWEALTH *vs.* EARL SHOLLEY.

Norfolk. October 6, 2000. - November 30, 2000.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & SOSMAN, JJ.

*Threatening. Constitutional Law,* Freedom of speech and press. *Idle and Disorderly Person. Disruption of Court Proceedings. Evidence,* Prior misconduct, Relevancy and materiality, Motive, Reputation. *Words,* "Disorderly," "Tumultuous."

At the trial of a complaint for threatening to commit a crime, evidence of the circumstances in which the defendant stated "Watch out, Counselor," along with evidence of his demeanor and tone of voice, would permit a finder of fact to conclude that the statement was intended as a threat and caused the victim reasonably and justifiably to fear harm [724-726]; and, where the evidence was sufficient to establish each element of the crime, the speech was not protected under the First Amendment to the United States Constitution [726-727].

Evidence at the trial of a complaint alleging disorderly conduct was sufficient to warrant a fact finder to conclude that the defendant's threats, yelling, and screaming in a court house corridor was conduct both "threatening" and "tumultuous," and was disorderly in violation of G. L. c. 272, § 53. [727-731]

Evidence at the trial of a complaint for violation of G. L. c. 268, § 13C, was not sufficient to demonstrate that the defendant's disorderly conduct in a court house corridor disrupted any court "proceeding," and the defendant was entitled to a finding of not guilty. [731-732]

Prior bad acts of a criminal defendant were properly admitted at the trial of complaints for disorderly conduct and threats, where they bore on the issue of motive. [732]

No substantial risk of a miscarriage of justice arose, at the trial of a complaint for disorderly conduct, from the testimony of a police officer that she believed she had grounds to arrest the defendant for disorderly conduct and that she so warned the defendant. [732-733]

At a criminal trial, the judge properly excluded proffered evidence of the defendant's good character, where no proper foundation had been laid. [733-734]

COMPLAINT received and sworn to in the Quincy Division of the District Court Department on June 25, 1996.

The case was tried before *Paul F. X. Moriarty,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*John J. Amendolare* for the defendant.

*Patrick C. Lee*, Special Assistant District Attorney, for the Commonwealth.

SOSMAN, J. Earl Sholley was convicted of threatening to commit a crime (G. L. c. 275, § 2), being a disorderly person (G. L. c. 272, § 53), and disrupting court proceedings (G. L. c. 268, § 13C). The Appeals Court affirmed the conviction of threatening to commit a crime, but reversed the conviction of being a disorderly person (on the ground that the defendant's conduct did not come within the ambit of G. L. c. 272, § 53) and the conviction of disrupting court proceedings (on the ground that there was no evidence that any particular proceeding had been disrupted). *Commonwealth* v. *Sholley*, 48 Mass. App. Ct. 495, 504 (2000). We granted the parties' applications for further appellate review. We affirm the convictions of threatening to commit a crime and being a disorderly person and reverse the conviction of disrupting court proceedings.

1. *Facts.* At the time of the incident giving rise to these convictions, Earl Sholley was active in an organization dedicated to "fathers' rights." This organization was critical of what it viewed as the court system's unfair treatment of fathers and husbands in domestic relations and domestic violence cases. Sholley and other members of the group had expressed their criticism by various methods, including demonstrations and leafletting in the vicinity of the Quincy Division of the District Court Department.

Prosecutions of domestic violence cases in the Quincy District Court were conducted principally by Assistant District Attorney Courtney Cahill, and some of Sholley's protest activities had specifically targeted Cahill as the prosecutor responsible for what he and his organization perceived as unfair verdicts and sentences. Cahill was aware of Sholley's involvement in the demonstrations protesting her work on such cases and was aware of Sholley's passionate views on the subject.

On June 24 and 25, 1996, Raymond Barrio was being tried in the Quincy District Court on a charge of violating a restraining order. Cahill was prosecuting the case. Sholley and his organization supported Barrio and viewed his trial as another example

of the court's unfairness toward men.[1] Sholley had attended the first day of the trial, but was not in the court room the next day when the jury returned a verdict of guilty and the judge sentenced Barrio to a term of incarceration.

After the proceedings had concluded, Sholley arrived and looked into the court room, located on the second floor of the court house. The court officer, Kirk Parks, came out to see what Sholley wanted. Sholley asked Court Officer Parks what had happened to the Barrio case, and Parks informed Sholley of the verdict and sentence. On hearing that Barrio had been sent to jail, Sholley began shouting and yelling in a manner that Parks described as "out of control."[2] When Parks asked Sholley to keep his voice down, Sholley yelled even more loudly in a tone of voice that witnesses described as "screaming."

Parks directed Sholley to leave the building. Sholley proceeded to run through the corridor and down the stairway, still yelling and screaming, followed by Parks.[3] As Sholley reached the top of the stairs, he shouted, "This means war! There's going to be bloodshed all over the streets!" Sholley yelled out this particular exclamation several times.

When Sholley's outburst started, Cahill was on the first floor of the court house handling bails and arraignments in the first session. She was at the door in front of the first session court room speaking with another attorney when she heard what she described as "a huge commotion upstairs." She had supervisory responsibility over other assistant district attorneys and, on hearing this "huge commotion," Cahill's assessment was that she "needed to go upstairs and make sure that everything was okay with the other [assistant district attorneys]." Accordingly, she broke off her discussion with the attorney and started up the stairway to the second floor.

---

[1]Barrio had previously been convicted of assault and battery on his son, for which he had served a one-year jail sentence. Sholley was of the view that Barrio's earlier trial and sentence had also been the product of court and prosecutorial bias against fathers who "disciplined" their children.

[2]Sholley's tirade included epithets directed at the judge who had presided over the Barrio trial, referring to her as "that fuckin' bitch" and opining, "She's fucked now." At the time of this outburst just outside her court room, the judge was on the bench conducting other business unrelated to the Barrio case.

[3]Parks followed Sholley because he wanted to be certain that Sholley would leave the premises. In doing so, he abandoned his post as the sole court officer securing a court room that was still in session.

Sholley was running down the stairs as Cahill was climbing up. When he encountered Cahill on the stairway, Sholley stopped, pointed his finger at Cahill's face, and yelled, "Watch out, Counselor." Cahill testified that Sholley was "[i]nches" from her at the time and that this remark was yelled "in an angry tone." Cahill recognized Sholley from his prior protest activities and knew that he had been at the court house the previous day to support Barrio. She testified that she was "extremely frightened" by Sholley's statement and gesture and that she continued up the stairs "to get away from him."

Meanwhile, others in the court house also responded to this commotion. When Sholley's yelling began, Parks saw people "peeking out" of offices and out of the other second-floor court room, apparently trying to see what was happening. On the first floor, various people came rapidly out of the first session court room and stopped to watch Sholley. Others came out of the first floor probation office.

Detective Barbara DiNatale, a police prosecutor, was going down the stairs when Sholley ran past her "screaming" about "war" and "bloodshed." She "pursue[d]" him outside. Three other police officers, who had been at the court house to testify in other proceedings, also responded and followed outside with Detective DiNatale and Court Officer Parks.[4]

Once outside the court house, Sholley began passing out his group's literature. He approached a court employee who was outside on her break and insisted that she take the materials he was handing out. When she refused, he said, "Remember what happened in Oklahoma. This is a bomb ready to explode." The employee was frightened by Sholley's remark.

Detective DiNatale then spoke to Sholley, advising him that she could arrest him and asking him to leave the area. After a brief conversation with DiNatale, during which Sholley asked DiNatale what he had done that was disorderly and DiNatale related to him the conduct she had observed that she considered disorderly, Sholley proceeded up the street to Quincy Square, where he continued handing out leaflets.

The total time elapsed, from the commencement of Sholley's yelling to his departure from the area, was two to three minutes.

2. *Threatening to commit a crime.* "The elements of threaten-

---

[4]The record does not reveal where these three other officers were at the time they first heard Sholley.

ing a crime include an expression of intention to inflict a crime on another and an ability to do so in circumstances that would justify apprehension on the part of the recipient of the threat." *Commonwealth* v. *Robicheau,* 421 Mass. 176, 183 (1995). Sholley argues that the only words he directed at Cahill (i.e, the phrase, "Watch out, Counselor") do not express any intent to commit a crime. Thus, he contends that he was entitled to a required finding of not guilty on the threats charge.

The assessment whether the defendant made a threat is not confined to a technical analysis of the precise words uttered. Rather, the jury may consider the context in which the allegedly threatening statement was made and all of the surrounding circumstances. For example, in *Commonwealth* v. *Elliffe,* 47 Mass. App. Ct. 580, 582 (1999), the victim had brought parental kidnapping charges against her former husband. As the kidnapping case was progressing, the victim claimed that the defendant had come to her house, assaulted her, and told her in an angry voice, "Drop the charges." *Id.* at 581-582. The defendant argued that there was nothing threatening in the words, "Drop the charges." *Id.* at 583. Noting that the words were to be viewed "in the context of the actions and demeanor which accompanied them," the Appeals Court held that the evidence was sufficient to make out a case of threatening to commit a crime. *Id.* at 582. Similarly, in *Commonwealth* v. *Strahan,* 39 Mass. App. Ct. 928 (1995), the defendant, a known environmental activist who had been protesting whale-watching excursions, was asked by the ship's mate to step down off the gangplank of a whale-watching boat. The defendant replied that he was "assessing the enemy" and that he was "just looking for, for a place to put a hole in the boat." *Id.* at 929. The Appeals Court rejected the defendant's technical "parsing" of his words, opining that the words should not be "taken in isolation from his other statements and the context in which they were made." *Id.* See *Commonwealth* v. *DeVincent,* 358 Mass. 592, 595 (1971) (in prosecution of attempted extortion, issue whether defendant's statement constituted threat of bodily injury not governed by "the dictionary definition of the words used" or by their meaning "in the abstract" but rather was to be viewed in light of "the circumstances attending their use" and "context").

Here, the context of the defendant's statement, along with his demeanor and tone of voice at the time the statement was made, would permit the jury to conclude that the statement was

intended as a threat. Based on his belief that Barrio had been wrongly convicted and unjustly imprisoned a second time, Sholley was enraged at the court system when he encountered Cahill, the prosecutor who was, in Sholley's view, responsible for this ostensible miscarriage of justice. He was "yelling" and "screaming" in an angry tone of voice, he had just been crying out a prediction of "war" and "bloodshed," and he stood only inches from Cahill pointing his finger in her face. In that context, the advice to "[w]atch out" may be interpreted as an expression of an intention to harm Cahill.[5] Cahill testified that is how she understood the remark, characterizing it as a warning that she should "watch [her] back." She also testified that she was "extremely frightened" as a result, and, given the context of the statement and the defendant's demeanor at the time, the jury could conclude that her fear was reasonable and justifiable.

Sholley also argues that his statement to Cahill constituted mere "political hyperbole" uttered as part of his criticism of the court system's handling of domestic violence cases and that, as such, it was speech protected by the First Amendment to the United States Constitution and art. 16 of the Declaration of Rights, as amended by art. 77 of the Amendments to the Massachusetts Constitution. He likens himself to the draft protester in *Watts v. United States*, 394 U.S. 705, 706, 707 (1969), whose announcement at a rally that, if drafted and forced to carry a rifle, "the first man I want to get in my sights is L.B.J.," was held to be protected speech, not a criminal threat to kill the President.[6]

"[T]he First Amendment does not protect conduct that threatens another." *Commonwealth v. Robicheau*, 421 Mass. 176, 183 (1995). See *United States v. Fulmer*, 108 F.3d 1486, 1492-1493 (1st Cir. 1997) ("a true threat is unprotected by the

---

[5] It is of no consequence that the threat pertained to some uncertain time in the future. See *Commonwealth v. Ditsch*, 19 Mass. App. Ct. 1005, 1005 (1985) (letter sent by inmate at house of correction could constitute a threat to commit a crime as "absence of immediate ability, physically and personally, to do bodily harm" does not preclude conviction of threats).

[6] The facts in *Watts v. United States*, 394 U.S. 705 (1969), bear no resemblance to the facts of the present case. Sholley was not delivering a speech to a crowd at a rally, nor was he making statements about what he would "want" to do "if" some other event occurred. Rather, he was yelling directly at his victim, standing inches from her, angrily warning her that she should "Watch out."

First Amendment"). The free speech issues concerning the offense of threatening to commit a crime are resolved by defining the elements of the crime in a way that prevents a conviction based on protected speech. See *Robinson* v. *Bradley*, 300 F. Supp. 665, 668-669 (D. Mass. 1969) (dismissing action seeking to enjoin enforcement of G. L. c. 275, §§ 2 et seq., where likely interpretation of the statute would satisfy First Amendment). By limiting the crime of threats to those cases where the defendant expresses an intention to inflict a crime on another, has the ability to carry out that crime, causes the victim to fear harm, and does so in circumstances that make the victim's fear justifiable, the offense of threatening to commit a crime only reaches cases of "true threats" that would not qualify as protected speech. Where, as here, the evidence was sufficient to satisfy each element of the crime, there is no violation of Sholley's First Amendment or art. 16 rights.

3. *Disorderly person.* Sholley contends that his conduct was not "disorderly" within the meaning of G. L. c. 272, § 53. The interpretation of the term "disorderly" for purposes of § 53 has had a "tortured history" in our jurisprudence, *Commonwealth* v. *Feigenbaum*, 404 Mass. 471, 473-474 (1989), driven principally by the difficulties of defining the offense in a way that avoids any infringement of free speech rights. Having initially avoided a vagueness challenge by adopting the definition of "disorderly conduct" set forth in the Model Penal Code § 250.2 (Proposed Official Draft, 1962),[7] *Alegata* v. *Commonwealth*, 353 Mass. 287, 304 (1967), we later ruled that subsection (b) of that Code provision was unconstitutionally overbroad in its potential application to protected speech, *Commonwealth* v. *A Juvenile*, 368 Mass. 580, 587-595 (1975). More recently, in *Commonwealth* v.

---

[7]Section 250.2 of the Model Penal Code (Official Draft and Revised Comments, 1980), defines the crime of disorderly conduct as follows:

"A person is guilty of disorderly conduct if, with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he: (a) engages in fighting or threatening, or in violent or tumultuous behavior; or (b) makes unreasonable noise or offensively coarse utterance, gesture or display, or addresses abusive language to any person present; or (c) creates a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor."

The 1980 Official Draft of § 250.2 is unchanged from the 1962 Proposed Official Draft that we approved in *Alegata* v. *Commonwealth*, 353 Mass. 287, 304 (1967).

*Feigenbaum, supra* at 475, we held that, under subsection (c) of § 250.2, a defendant whose creation of a hazardous or physically offensive condition occurred as part of a political protest could not be convicted under G. L. c. 272, § 53, as the Commonwealth had failed to show that the conduct served "no legitimate purpose of the actor." What now remains of the definition of "disorderly" conduct is subsections (a) and (c) of § 250.2 of the Model Penal Code, with any application of subsection (c) restricted to cases not involving protest or other expressive activities (as required by the *Feigenbaum* decision). Sholley contends that his outburst in the court house corridor was part of his political protest against the unfair prosecution of husbands and fathers and that, under the *Feigenbaum* analysis, G. L. c. 272, § 53, does not proscribe such conduct.

The Commonwealth contends, correctly in our view, that Sholley's conduct comes within subsection (a) of § 250.2 of the Model Penal Code, which covers a defendant who, with the requisite intent to cause public inconvenience, annoyance or alarm, "engages in fighting or threatening, or in violent or tumultuous behavior."[8] While Sholley did not engage in any "fighting" or in any physically "violent" behavior, his conduct was both "threatening" and "tumultuous."

As discussed above, Sholley's outburst included the offense of threatening to commit a crime. Other aspects of his tirade included remarks of a threatening nature, even if they fell short of threatening to commit a crime. The assertion, in reference to the judge who had presided at Barrio's trial, that "[s]he's fucked now," suggests an intention to wreak vengeance against her for having sentenced Barrio to jail. Sholley's concluding statement to a court house employee that she should "[r]emember what happened in Oklahoma" and that "[t]his is a bomb ready to

---

[8]Where the prosecution of Sholley does not rely on subsection (c), the Commonwealth does not have to show the absence of any "legitimate purpose," and the interpretation of subsection (c) provided by *Commonwealth v. Feigenbaum*, 404 Mass. 471 (1989), is irrelevant. See *Commonwealth v. Sinai*, 47 Mass. App. Ct. 544, 547-548 (1999) (prosecution for fighting, threatening to fight, or tumultuous behavior under subsection [a] does not require proof that conduct had "no legitimate purpose"; requirement of showing "no legitimate purpose" pertains exclusively to prosecution under subsection [c]). The Appeals Court's analysis of Sholley's disorderly conduct erroneously grafted the "no legitimate purpose" requirement of subsection (c) onto a prosecution that was based solely on subsection (a). *Commonwealth v. Sholley*, 48 Mass. App. Ct. 495, 499-500 (2000).

explode" made the employee believe that Sholley's opposition to the courts was now about to take a violent form.

Sholley's conduct would also qualify as "tumultuous." "Tumultuous" conduct, "while perhaps not physically violent, may nevertheless be characterized as involving riotous commotion and excessively unreasonable noise so as to constitute a public nuisance." *Commonwealth* v. *A Juvenile, supra* at 597. The question whether Sholley's screaming and running through the court house corridor would qualify as "tumultuous" is a matter of degree. Viewed in the light most favorable to the Commonwealth, the evidence would support the conclusion that the level of noise and commotion caused by Sholley's behavior was indeed extreme.

Contrary to the Appeals Court's assessment that this was merely "the hurly-burly that characterizes any busy District Court," *Commonwealth* v. *Sholley, supra* at 501, the evidence indicated that this outburst in fact went far beyond the level of noise and commotion ordinarily encountered in court house hallways. One indication of the extreme level of noise and commotion engendered by Sholley's outburst is the number of persons who abandoned their ordinary duties to respond to that noise and commotion. When Sholley refused to lower his voice, Court Officer Parks left his post, abandoning a sitting judge and leaving her with no court officer, in order to ensure that Sholley left the court house premises. A jury could properly infer that only a situation of some seriousness or perceived danger would cause a court officer to abandon his primary job function. Cahill, hearing the commotion from her vantage point downstairs in front of the first session, viewed it as sufficiently alarming that she broke off her discussions with another attorney to go upstairs and make certain the assistant district attorneys under her. supervision were in no danger. Three police officers at the court house to testify in other cases similarly abandoned their activities to respond to the outburst, apparently thinking that their assistance might be needed to quell the disturbance. The conduct of Court Officer Parks, Cahill, and the three police witnesses strongly suggests that Sholley's screaming gave rise to a sense of emergency on the part of those who heard it, an emergency that went way beyond the ordinary "hurly-burly" to which they were accustomed. This evidence also suggests that the noise level of Sholley's yelling and screaming was suf-

ficiently extreme to qualify as "excessively unreasonable."[9] *Commonwealth* v. *A Juvenile, supra* at 597.

Numerous other persons at the court house responded to the commotion. People were peering out of doors on the second floor to see what was happening, and people came out of the first session and the probation department on the first floor. Noisy behavior that attracts a crowd of onlookers is a common feature of cases involving "tumultuous" conduct. See *Commonwealth* v. *Richards*, 369 Mass. 443 (1976); *Commonwealth* v. *Sinai*, 47 Mass. App. Ct. 544 (1999); *Commonwealth* v. *Mulero*, 38 Mass. App. Ct. 963 (1995); *Commonwealth* v. *Carson*, 10 Mass. App. Ct. 920 (1980).[10]

The issue is not whether any one aspect of Sholley's conduct, in isolation, would constitute "disorderly" conduct. The issue is whether the several threatening remarks and the two-to-three minute period of loud screaming would, taken together, amount to "disorderly" conduct. Nor is it a question whether that conduct or that noise level for that same period of time would be "disorderly" in some other setting.[11] Here, the fact that Sholley's threats, yelling and screaming occurred in a court house, while several court rooms were in session, makes the conduct far more damaging to public order than would the same noise level — or even words suggestive of threats — at, for example, a sporting event. At a court house, the level and duration of "commotion" that can be tolerated by the public is relatively

[9]Defense counsel's opening statement acknowledged that Sholley has "a fairly deep and loud resonant voice." When he later testified, Sholley himself confirmed in vivid terms that his voice, when raised, is exceptionally powerful: "If I had yelled, there would have been corpses coming out of the cemetery."

[10]In *Commonwealth* v. *Sinai, supra* at 548, the Appeals Court distinguished *Commonwealth* v. *Zettel*, 46 Mass. App. Ct. 471 (1999), by noting that Sinai's screaming and yelling at an officer during an argument about a parking fee had attracted a crowd whereas Zettel's "loud" argument with an officer about her double-parked car had not risen to the level of "screaming and yelling" and had not attracted a crowd.

[11]We have noted, with reference to that portion of G. L. c. 272, § 53, that addresses "disturbers of the peace," that the conduct proscribed varies with the setting and the surrounding circumstances. *Commonwealth* v. *Orlando*, 371 Mass. 732, 735 (1977), and cases cited (noting that hurling objects in deserted location would not disturb peace while hurling objects in populated area would be violation, and that loud and abusive language in public store might not be violation but that loud yelling late at night in residential neighborhood would be violation).

low, and the point at which noise becomes "excessively unreasonable" is also relatively low. Viewed in the light most favorable to the Commonwealth, the evidence here supports the conclusion that the level of commotion and noise engendered by Sholley's outburst in the courthouse corridor, taken in combination with his menacing remarks, constituted "disorderly" conduct in violation of G. L. c. 272, § 53.

4. *Disruption of court proceedings.* Sholley was convicted of violating G. L. c. 268, § 13C, which provides: "Whoever causes or actively participates in the willful disruption of proceedings of any court . . . may be punished . . . ." Sholley contends that there was no evidence that he had disrupted any court proceeding. The Commonwealth argues that Sholley's outburst in the court house distracted court personnel and witnesses at a time when at least two court rooms were in session and that that suffices to prove a disruption of court proceedings under G. L. c. 268, § 13C.

We agree with the defendant, and with the Appeals Court, that the Commonwealth must show some impact on at least one "proceeding" in order to establish a violation of G. L. c. 268, § 13C. *Commonwealth v. Sholley, supra* at 501. As discussed above, there was ample evidence that Sholley's conduct was highly distracting and alarming.[12] It certainly had the potential to disrupt the proceedings that were underway in the various court rooms at the Quincy District Court. However, the record is silent as to what impact — if any — this disturbance in the corridor actually had on any of those proceedings. The Commonwealth points out that various persons suspended their normal court house activities to respond to or watch Sholley's outburst, but such temporary abandonment of their duties may have had no impact whatsoever on any proceeding, or only such minimal impact as not to constitute a "disruption." See *Commonwealth v. Bohmer,* 374 Mass. 368, 375 (1978) (comparable provision of G. L. c. 272, § 40, prohibiting interruption or disruption of schools extends only to "activity that so significantly disrupts their functioning as to impair the accomplishment of their educational goals").

For purposes of the present case, we need not address precisely what form or degree of impact on a court proceeding

---

[12]As also discussed above, the fact that this conduct took place in a court house while it was in session is a circumstance that may properly be taken into account in determining whether the defendant's conduct was "disorderly."

need be shown to establish a "disruption" that would violate
G. L. c. 268, § 13C. Here, there was no evidence of any actual
impact on any proceeding. Sholley was thus entitled to a
required finding of not guilty on the charge of disrupting court
proceedings.

5. *Prior bad acts.* Sholley contends that the judge erred in al-
lowing the prosecutor to elicit evidence, on cross-examination,
of Sholley's own prior conviction of assault and battery and of
the issuance of temporary restraining orders against him at the
request of his wife and daughter.[13] There was no substantial risk
of a miscarriage of justice. The prior bad acts at issue — an as-
sault and battery that had apparently led to the issuance of a
G. L. c. 209A restraining order — were not similar to the crimes
with which Sholley was charged. They were comparable to the
offenses at issue in the Barrio trial, and evidence that Sholley's
support of Barrio was a product of his personal identification
with Barrio, and not just a matter of abstract principle, was
relevant to the contested issue of how extreme Sholley's reac-
tion to the Barrio verdict had been. That Sholley's dislike of
domestic violence prosecutors was a matter of personal grudge,
and not just political philosophy, was relevant to the jury's as-
sessment whether Sholley had been "out of control" on the day
in question (as the Commonwealth claimed) or whether he had
merely spoken in a mildly angry tone to express his philosophi-
cal disagreement with the Barrio verdict (as Sholley claimed).
Evidence of prior bad acts may, as here, be relevant to motive,
and the judge acted well within his discretion to allow evidence
of Sholley's own personal involvement with the courts on
domestic violence issues.

6. *Warning that Sholley would be arrested.* Sholley also
argues that it was error to allow Detective DiNatale to testify to
her "personal opinion" that she had a basis for a disorderly
conduct arrest as of the time that she warned Sholley that she
would arrest him for disorderly conduct. There was no objec-

---

[13]There was no objection by defense counsel to this line of questioning, but
Sholley himself, when first asked about his prior conviction, responded, "I'm
not sure what this has to do with the proceedings, Your Honor." We reject the
assertion that a comment from a witness is sufficient to preserve an issue for
appeal. In the absence of any proper objection from trial counsel, the ap-
propriate standard of review is whether there is a substantial risk of a miscar-
riage of justice. Treating the matter as a claim of ineffective assistance of
counsel, the standard of review is the same. See *Commonwealth* v. *Curtis,* 417
Mass. 619, 624-625 n.4 (1994).

tion to this testimony, so our standard of review is whether there was a substantial risk of a miscarriage of justice.

We see no such risk. The sequence of events concluded with Detective DiNatale's telling Sholley that she would arrest him for disorderly conduct if he did not leave the premises, Sholley asking her what he had done that was disorderly, and DiNatale's recitation to Sholley of her observations in the court house that she considered disorderly. After this conversation, Sholley left the area of the court house and moved some 200 yards up the street. The defense opening statement (and closing argument) made much of the fact that Sholley had obeyed when asked to leave the court house and when asked by Detective DiNatale to leave the area surrounding the court house. A recitation of the actual conversation with Detective DiNatale was relevant from the perspective of both sides.

While the use of the term "personal opinion" during this testimony was objectionable, the single reference to Detective DiNatale's "opinion" was not prejudicial. From the fact that Sholley was ultimately arrested and charged, the jury would already be aware that the police and the prosecutor were of the "opinion" that there was good ground for pressing the charges. The judge's instructions properly advised the jury that they were the sole and exclusive judges of the facts, that they were the sole judges of witness credibility, and that the complaints against the defendant were not evidence of guilt.[14] That the jury heard Detective DiNatale testify that she believed she had a basis to arrest the defendant for disorderly conduct and that she so warned him at the time would not have caused them to defer to Detective DiNatale's assessment.

7. *Character evidence.* Sholley contends that the judge improperly excluded his proffered evidence of his good character. There was no error, as the foundation for such evidence was lacking. One witness testified that she had not discussed the defendant's reputation for "truth and honesty" with anyone but merely sought to express her own opinion. Another witness indicated that he had had one discussion with an unidentified person about Sholley's reputation for lack of violence, but never identified who that person was or the relevant group or community with which that person was

---

[14]At the time of empanelment, the jurors had also been asked whether they would believe the testimony of a police officer over the testimony of a civilian witness on account of the officer's status.

associated. The final character witness claimed to have had discussions about Sholley's reputation for lack of violence, but never identified any group or community in which that reputation was based. None of these attempts to introduce evidence of good character met the foundation requirements. See *Commonwealth* v. *Dockham*, 405 Mass. 618, 631 (1989), and cases cited.

8. *Conclusion.* For the foregoing reasons, the judgments of conviction on the charges of threatening to commit a crime and being a disorderly person are affirmed. The judgment of conviction on the charge of disrupting court proceedings is reversed.

*So ordered.*