COMMONWEALTH vs. MICHAEL A. MARCAVAGE.

No. 08-P-1294.

Essex. May 8, 2009. - December 23, 2009.

Present: BERRY, MILLS, & WOLOHOJIAN, JJ.

*Practice, Criminal,* Findings by judge. *Idle and Disorderly Person. Constitutional Law,* Freedom of speech and press, Freedom of religion. *Words,* "Tumultuous behavior."

At the trial of a criminal complaint charging disorderly conduct, in violation of G. L. c. 272, § 53, the evidence was sufficient to sustain the defendant's conviction, where the defendant, by refusing to comply with police orders to cease using a megaphone in a dangerously crowded and noisy public area on Halloween night in Salem, created a threat to public safety, exposing both the police and the public to danger by reducing the ability of police to maintain order, and therefore, the defendant's conduct amounted to "tumultuous conduct" [36-38]; further, the police acted lawfully by ordering the defendant to cease using the megaphone once they determined that his conduct posed such a public safety risk, in that their orders were not in any way connected with the content of the defendant's speech and did not prevent the defendant from disseminating his message, but rather were directed only at the manner of the defendant's delivery, and were imposed in direct response to the changing conditions [39-40].

COMPLAINT received and sworn to in the Salem Division of the District Court Department on November 1, 2007.

The case was heard by *Michael A. Uhlarik,* J.

*Benjamin D. DuPré,* of Alabama, for the defendant.

*Catherine Langevin Semel,* Assistant District Attorney, for the Commonwealth.

MILLS, J. The defendant, a street evangelist, was arrested on Halloween night, 2007, in the city of Salem and charged with disorderly conduct, G. L. c. 272, § 53. He was convicted following a bench trial in the District Court, and argues on appeal that (a) the evidence was insufficient; (b) he received inadequate notice of the Commonwealth's theory of the case; and (c) the

confiscation of a megaphone by police violated various State and Federal constitutional protections. We affirm.

*Background.*[1] The defendant is the director of a proselytizing group that visits Salem each Halloween to preach to the crowds. Late in the afternoon, the defendant and his group stationed themselves in the Townhouse Square section of Salem.[2] The area was extremely congested (most people stood "elbow-to-elbow") and contained a dry fountain with an exterior wall comprised of three steps. Some group members took turns preaching with a megaphone from atop the fountain wall, while other members moved among the crowd gathered at its base. This was a visit that the defendant and his group made annually to Salem. They were well aware of the Halloween event and the crowd and conditions during the evening of Halloween.

The defendant's interactions with the crowd generated many complaints to police. He blocked the path of some people and encroached upon the personal space of others with his megaphone. Some people were frightened by him. The defendant waved a Bible "within inches" of people's faces. Some people became upset and backed away, while others walked around him. Other times, the defendant prompted complaints by using his megaphone within a foot of the faces of people passing by. His voice "tower[ed] over most," notwithstanding that it was an extremely loud night. On three or four occasions between 7:30 and 8:30 P.M., the defendant accosted people by approaching them and yelling, at times within inches of their faces, and he created more of a disturbance than any other person in the area. A police officer relayed complaints he had received about the defendant to his supervisor, who also had received complaints regarding the defendant's behavior.

Meanwhile, as the night progressed, more people entered Salem and the earlier family atmosphere began to disappear.

[1] We recite the evidence in the light most favorable to the Commonwealth, *Commonwealth* v. *Latimore*, 378 Mass. 671, 677-678 (1979), for purposes of evaluating the sufficiency of the evidence. To the extent that our recitation is inappropriate for evaluating other arguments, we so specify.

[2] As many as 100,000 people were present in Salem on that Halloween night. Of those, as many as 20,000 were present in the immediate area surrounding Townhouse Square, which is the center of the Halloween activity and the principal pedestrian route for the crowds.

The crowd became more hostile with the addition of intoxicated individuals. It became a younger crowd with a "lot of college students." At around 8:00 P.M., the supervising police officer approached the defendant and one of his colleagues. The latter, standing atop the fountain wall, was preaching with a megaphone while the defendant stood nearby. The supervising officer ordered that the defendant's colleague cease use of the megaphone.[3] The colleague complied, and the officer left the area.

At approximately 8:20 P.M., the defendant resumed use of the megaphone, at which point the police officers promptly reiterated the order and warned that confiscation of the megaphone or arrest might result if the defendant refused to cooperate. The defendant temporarily complied with the order.

Around 8:35 P.M., the defendant, contrary to the police orders, persisted in using the megaphone. The supervising police officer approached the defendant once more, reiterated the earlier orders, and after issuing another warning, attempted to confiscate the megaphone. The defendant held tightly to the megaphone and verbally protested the confiscation. Two officers assisted the supervisor, and pushing and shoving between the defendant and the officers resulted. Then, the defendant "went limp," which caused him to fall into the fountain, bringing the officers to the ground with him. Immediately thereafter, the officers stood up and arrested the defendant. The crowd was noisy and raucous, and the area was congested and became dangerous. The defendant, by refusing police orders and resisting the confiscation of the megaphone, drew a hostile crowd that was out of control. The police were concerned for their own safety as well as the safety of the crowd.[4]

*Discussion.* Ordinarily, in assessing whether the evidence adduced at trial is sufficient to meet the government's threshold

[3]In the interests of public safety, police supervisors instructed officers that all megaphone use should be stopped at 8:00 P.M. on Halloween. The order was only a small measure the police undertook to ensure public safety during what is Salem's most notorious night. The parties have argued extensively in their briefs and at oral argument about the Salem sound ordinance, which prohibits the use of megaphones after 10:00 P.M. The ordinance is irrelevant here. The supervising police officers had made a decision, in the interests of public safety and order, to curtail behavior they reasonably believed to threaten the safety of the public.

[4]Approximately 200 police officers were on duty that night assigned to

burden of proof, all evidence presented to the fact-finder is considered. Moreover, the evidence is, according to the familiar formulation, "viewed in the light most favorable to the Commonwealth." See *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979). Here, however, there are strong indications in the record that the fact finder — in this case the trial judge — expressly discredited at least some of the government's proof; viz., evidence that the defendant had engaged in violent or tumultuous conduct *apart* from his refusal to obey a police order to stop using the megaphone. Consistent with these findings, the judge apparently premised the defendant's conviction solely on his defiance of the order to stop using the megaphone and the direct consequences of his refusal to do so.[5] In these circumstances, our inquiry is limited to the question whether those actions, in context, amounted to disorderly conduct as contemplated by G. L. c. 272, § 53.[6]

General Laws c. 272, § 53, proscribes, inter alia, engaging in

---

maintain order and assure public safety. In an earlier year, on Halloween evening in Salem, there were two shootings, several stabbings, and sixty arrests, with many more individuals taken into protective custody. Each year, intoxication among the crowd was a major issue, and increased as the evening progressed. In 2007, the Salem police force was augmented by police officers from surrounding communities as well as some members of the sheriff's department and mounted officers from the Boston police department. There were approximately six officers specifically assigned to monitor the Townhouse Square area.

[5]The judge's findings may well have reflected his legitimate concern that, to the extent that the record left open the possibility that the defendant's conviction was premised, even in part, on conduct shielded by the First Amendment (e.g., the defendant's missionary appeals and preaching), it might have been susceptible to reversal on appeal. See *Commonwealth* v. *Richards*, 369 Mass. 443, 446-448 (1976). The judge indicated that the defendant's conviction rested solely on the evidence of his refusal to obey the police command to stop using the megaphone, and the consequences therefrom, and that the defendant had not been convicted on the basis of any protected conduct.

[6]The defendant alleges that this conduct — continuing to use the megaphone after being requested to stop by police — is not encompassed by the bill of particulars. However, the bill of particulars put the defendant on notice that it was the loud disturbance created by his "yelling [and] screaming," together with the resulting "public . . . alarm" that was the basis of the disorderly conduct charge. While the megaphone is not mentioned specifically, the focus in the bill of particulars nonetheless was on the high noise level associated with the defendant's activities and the effects of same. The bill of particulars also incorporated by reference documents that the Commonwealth had previously provided to defense counsel, including a police report that contained a description of the defendant's megaphone use.

"tumultuous behavior." *Commonwealth* v. *Feigenbaum*, 404 Mass. 471, 474 (1989). While susceptible to multiple meanings, see *Commonwealth* v. *Sholley*, 432 Mass. 721, 727-728 (2000), "tumultuous behavior," for the purposes of § 53, includes the refusal to obey a police order. See *Commonwealth* v. *Sinai*, 47 Mass. App. Ct. 544, 548-549 (1999). There, the defendant, angry at being forced to pay a parking fee, refused a police order to leave the area; pounded the steering wheel of his car and shouted obscenities; attracted a large crowd of onlookers; forced traffic to be rerouted; and resisted attempts by police to take him into custody. This behavior, the court concluded, amounted to "tumultuous conduct." *Id.* at 549.

The facts of the present case require a consistent result. The evidence supports the inference that the defendant, by refusing the police order to stop using the megaphone, created the same sort of threat to public safety occasioned by the defendant's conduct in *Commonwealth* v. *Sinai, supra.* Indeed, if anything, the danger was far greater here in view of the very large crowds involved, the likely widespread public intoxication, the history of criminal conduct on Halloween in Salem, and the intensity of the physical altercation between the defendant and police.

Bolstering our conclusion that the defendant's conduct amounted to tumultuous behavior is the fact that there was evidence that the defendant, by disobeying the order to stop using the megaphone, had engendered hostility toward police and disrespect for their authority among the crowd. Precisely the same factors were cited in *Commonwealth* v. *Richards*, 369 Mass. 443, 446-448 (1976), in concluding that the defendant had engaged in tumultuous behavior. Likewise, in *Commonwealth* v. *Carson*, 10 Mass. App. Ct. 920, 921 (1980), we relied upon the fact that the defendant's conduct "attracted approximately 50 people, some of them laughing or yelling abuse at the police," in concluding that the defendant properly had been convicted of being a disorderly person under § 53. The defendant's actions here, like those of the defendants in *Richards* and *Carson*, exposed both the police and the public to danger by reducing the ability of police to maintain order. See *Commonwealth* v. *Mulero*, 38 Mass. App. Ct. 963, 965 (1995) (defendant engaged in tumultuous behavior when he flailed his hands "in an agitated and belligerent manner while berating [the officer] with loud profanities").

Finally, while the defendant argues otherwise, we conclude that the police had ample authority to order the defendant to stop using the megaphone once they determined that such conduct posed a public safety risk. Within the scope of their community caretaker function, and under the general power of arrest conferred on police by G. L. c. 41, § 98,[7] police have authority to take reasonable protective measures whenever public safety is threatened by acts that are dangerous, even if not expressly unlawful. See, e.g., *Commonwealth* v. *Bates*, 28 Mass. App. Ct. 217, 219 & n.2 (1990) (emergency or "community caretaker" exception authorizes police to make otherwise unlawful entries or searches in certain emergencies "to protect or preserve life or avoid serious injury"). As the judge specifically found, the police exercised that power with admirable restraint on the night of the defendant's arrest. Several government witnesses testified that the defendant's use of the megaphone cultivated both fear and anger in the very large crowd, which implicated legitimate safety concerns.

Contrary to the defendant's claims, we find nothing in the record to support the inference that the decision to curtail the defendant's use of the megaphone was in any way connected with the content of his speech. See *Ward* v. *Rock Against Racism*, 491 U.S. 781, 791 (1989). Indeed, as the defendant concedes, similar limits were imposed on at least one other nearby group. It is also

---

[7]General Laws c. 41, § 98, as amended by St. 1967, c. 368, §§ 1, 2, provides, in relevant part:

"The chief and other police officers of all cities and towns . . . may disperse any assembly of three or more persons, and may enter any building to suppress a riot or breach of peace therein. Persons so suspected who do not give a satisfactory account of themselves, persons so assembled and who do not disperse when ordered, and persons making, aiding and abetting in a riot or disturbance may be arrested by the police, and may thereafter be safely kept by imprisonment or otherwise unless released in the manner provided by law, and taken before a district court to be examined and prosecuted.

". . .

"If a police officer stops a person for questioning pursuant to this section and reasonably suspects that he is in danger of life or limb, he may search such person for a dangerous weapon. If he finds such weapon or any other thing the possession of which may constitute a crime, he may take and keep it until the completion of the questioning, at which time he shall return it, if lawfully possessed, or he shall arrest such person."

significant to note that the police order by no means prevented the defendant from disseminating his message; rather, it was directed only at the manner of the defendant's delivery. See *Clark* v. *Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984) (manner restrictions in public spaces permissible provided they are content neutral, serve a significant government interest, and leave open alternative channels of communication). Moreover, the restriction was imposed in direct response to the changing conditions during the evening. See *Freedman* v. *Maryland*, 380 U.S. 51, 58-59 (1965) (describing procedural safeguards required to justify any prior restraint on potentially protected speech). Both of these factors militate in favor of finding the police action lawful as a measured and appropriate response to a bona fide public safety threat.

In view of the foregoing, we conclude that the defendant's failure to obey the police command to stop using the megaphone, in the particular context of Halloween night in Salem, ultimately created the kind of "hazardous or physically offensive condition affecting the public," *Commonwealth* v. *Molligi*, 70 Mass. App. Ct. 108, 111 (2007), cognizable by § 53. While his underlying conduct, particularly dissemination of his religious message, may have enjoyed First Amendment protection, that protection did not entitle him to disregard police commands reasonably calculated at ensuring public safety amid potentially dangerous circumstances. Moreover, the police-imposed limits were content neutral, and no more restrictive than necessary to protect the public. The defendant's conviction, therefore, transgressed no constitutional limits, and was otherwise proper in all respects. The defendant's motion for a required finding of not guilty was properly denied.

*Judgment affirmed.*