NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us.

SJC-12081

COMMONWEALTH  vs.  RICHIE ACCIME.


Suffolk.     November 9, 2016. - February 13, 2017.

Present:  Gants, C.J., Botsford, Lenk, Hines, Gaziano, Lowy, &
Budd, JJ.


Idle and Disorderly Person.  Self-Defense.  Practice, Criminal,
    Instructions to jury.



Complaint received and sworn to in the Central Division of
the Boston Municipal Court Department on July 19, 2011.

The case was tried before Annette Forde, J.

The Supreme Judicial Court granted an application for
direct appellate review.


Jeffrey A. Garland, Committee for Public Counsel Services,
for the defendant.
Donna Jalbert Patalano, Assistant District Attorney (Neil
J. Flynn, Jr., Assistant District Attorney, also present) for
the Commonwealth.
Bettina Toner, Robert D. Fleischner, Jennifer Honig, Chetan
Tiwari, & Phillip Kassel, for Center for Public Representation &
another, amici curiae, submitted a brief.


BOTSFORD, J.  The defendant, Richie Accime, appeals from

his disorderly conduct conviction under G. L. c. 272, § 53,

claiming there was insufficient evidence to support it.  The charge was brought against him in relation to his conduct as a patient in the psychiatric area of the emergency department at a hospital in Boston.  Accime argues that in the circumstances of this case, the Commonwealth failed to prove he consciously disregarded a "substantial and unjustifiable risk of public inconvenience, annoyance, or alarm."  Emphasizing the setting-specific inquiry required by our case law, we agree with the defendant and reverse the judgment of conviction.[1]

1.  Background.  a.  Facts.  Viewing the facts in the light most favorable to the Commonwealth, the jury could have found the following.  In the afternoon of June 5, 2011, the defendant was brought by ambulance and against his will to the emergency department of a hospital.  There he was involuntarily detained in a small room in the psychiatric area of the hospital's emergency department.  Although this detention was purportedly pursuant to G. L. c. 123, § 12 (a), which allows the temporary restraint and hospitalization of persons posing a serious risk of harm by reason of mental illness, according to the defendant, who testified at trial, he was shown no evidence of compliance with the procedures required by § 12 (a), nor was any such evidence produced at trial.

---

[1] We acknowledge the amicus brief of The Center for Public Representation and The Mental Health Legal Advisors Committee.

When told he would likely be held in the hospital for two or three days, the defendant began to shout. Medical staff requested assistance from hospital security officers and, on their arrival, instructed the officers not to allow the defendant to leave. At approximately 8 P.M., a security officer called for additional assistance; at least four other security responded. At least one officer was armed with a baton and handcuffs in addition to the pepper spray that was carried by at least three officers.

The officers attempted to persuade the defendant to take medication that he told them he did not want. Having heard the defendant repeatedly say, "I don't want to take the medication. I want to get out of here," the officers told him that if he refused to take the medication, he would be restrained, and later, that if he did not comply with orders he would be pepper sprayed.

In response to the officers' orders, the defendant stated, "I'm not taking any medications. You can't hold me here against my will"; "I don't want to fuck anybody up, but I guarantee I'm leaving one way or the other"; "if anybody puts their hands on me, I'm going to fuck them up"; and "if anybody pepper sprays me I'm going to beat the fuck out of them." Furthermore, when the officers first entered the room, the defendant had said, "The first person in, I'm going to break their arm. And then the

next person in, I'm going to break theirs, and then the next, and then the next."  Other patients were "looking on"; as a precautionary measure, officers directed anyone in the hallway to an alternate route "just in case something happened if [the confrontation] spilled out" of the room.[2]  The officers asked the defendant to calm down, and repeated their request that he accept medication.

The defendant took his shirt off,[3] and began pacing with clenched fists, hitting the open palm of one hand with the clenched fist of the other.  He repeated his desire to leave, insisted no one was going to stop him, and refused to sit on a stretcher to be restrained.  He then adopted a "fighting" stance.[4]

After officers threatened the use of pepper spray and approached the defendant, the defendant "put his hands out like

---

[2] There was no evidence introduced to suggest that any aspect of the disturbance the defendant was claimed to have caused in the room ever extended beyond the confines of the room.

[3] The defendant was described at trial as having a muscular build, weighing about 270 pounds, and standing about six feet, four inches in height.

[4] There was conflicting testimony as to whether this stance preceded or followed a supervising officer's statement to the defendant that he would be pepper sprayed if he refused to comply:  of three testifying officers, one testified that the stance came before the threat of pepper spray, one testified that the threat came first, and the third offered conflicting testimony on this point.

he wanted to fight."  At least three, and as many as six, officers then directed pepper spray at the defendant's head and face.[5]  The defendant retreated into a corner of the room and subsequently agreed to sit on the stretcher, where he was handcuffed before the spray was rinsed off him.

b.  Procedural history.  On July 19, 2011, a criminal complaint issued from the Boston Municipal Court Department charging the defendant with threatening to commit a crime in violation of G. L. c. 275, § 2; disorderly conduct in violation of G. L. c. 272, § 53; and assault in violation of G. L. c. 265, § 13A.  The defendant was tried before a jury in June, 2014.  He moved for a required finding of not guilty at the close of the Commonwealth's case and again at the close of his case; the trial judge denied each motion.  The judge also refused the defendant's requested instructions as to his right to use self-

---

[5] Two separate audio recordings of officers, describing the incident shortly after it had occurred, were admitted as trial exhibits and played several times before the jury.  In one recording, one officer said that "six of us sprayed the guy," and described the defendant as "built like a frigging refridge . . . too big, too jacked . . . like six four and 280 pounds of pure, just, ripped nastiness."  Stating in the recording that "we" "doused" and "covered" the defendant with pepper spray, this officer said that he had emptied his spray canister and that he and a third officer would need new ones.  This force notwithstanding, the other officer who was recorded conceded that officers "sprayed the big dude because he didn't want to comply.  But he didn't really fight back that much."  When asked whether the defendant would be locked up, the unnamed officer responded, "No.  He didn't fight.  He didn't really fight anyone.  He complied after, you know.  Everybody, like, five people sprayed him."

defense against excessive force, unlawful detention, and forcible medication.  The jury acquitted the defendant of assault, but convicted him of disorderly conduct, and failed to agree on a verdict on the charge of threatening to commit a crime.  Consistent with § 53, the judge imposed a fine on the disorderly conduct conviction.  The defendant filed a timely notice of appeal, and this court allowed his application for direct appellate review.

2.  Discussion.  a.  Sufficiency of the evidence.  The defendant argues that there was insufficient evidence to support his conviction of disorderly conduct under G. L. c. 272, § 53.  Specifically, he argues the Commonwealth failed to prove either (1) his recklessness in creating a risk of "public inconvenience, annoyance, or alarm," or (2) the "public" character of any such risk.  In reviewing this claim, we consider the evidence introduced at trial in the light most favorable to the Commonwealth, and determine whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979).

General Laws c. 272, § 53, provides that being a "[d]isorderly person[] and disturber[] of the peace" is a

criminal offense punishable by a fine for the first offense.[6] In order to interpret the term and ensure its constitutionality, this court has "engrafted the Model Penal Code definition of 'disorderly' onto the separate § 53 offense" of being a disorderly person. Commonwealth v. Chou, 433 Mass. 229, 231-232 (2001). As so construed, the disorderly conduct provision in § 53 requires proof that a person, "with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof," engage in "fighting or threatening, or in violent or tumultuous behavior" or create "a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor." Commonwealth v. Sholley, 432 Mass. 721, 727 n.7 (2000), cert. denied, 532 U.S. 980 (2001), quoting Model Penal Code § 250.2 (Official Draft and Revised Comments, 1980).[7] The comments to the Model Penal Code emphasize that "[n]othing

---

[6] General Laws c. 272, § 53, provides, in relevant part:

"(b) Disorderly persons and disturbers of the peace, for the first offense, shall be punished by a fine of not more than $150. On a second or subsequent offense, such person shall be punished by imprisonment in a jail or house of correction for not more than [six] months, or by a fine of not more than $200, or by both such fine and imprisonment." (Emphasis added.)

[7] In Commonwealth v. A Juvenile, 368 Mass. 580, 585-586, 587, 592 (1975), this court, construing the disorderly person provision, limited the adopted portion of the Model Penal Code definition to § 250.2(1)(a) and (c), because § 250.2(1)(b), in the court's view, was unconstitutionally overbroad, reaching protected speech.

less than conscious disregard of a substantial and unjustifiable risk of public nuisance will suffice for liability." Model Penal Code § 250.2 comment 2, at 328-329 (1980). See Commonwealth v. Feigenbaum, 404 Mass. 471, 475 (1989), quoting Model Penal Code § 250.2(2)(c) (Official Draft and Revised Comments, 1985) (disorderly conduct conviction requires proof that defendant "consciously disregard[ed] a substantial and unjustifiable risk that the material element exists or will result from his conduct").[8] "Conviction cannot be had merely on proof that an actor should have foreseen the risk of public annoyance or alarm." Model Penal Code § 250.2 comment 2, at 329 (1980).

Against this backdrop, the defendant argues there was insufficient evidence that he recklessly created a risk of public inconvenience, annoyance, or alarm. We agree. The Commonwealth argues the evidence shows that the defendant's "violent and tumultuous behavior" was motivated by his desire to leave the room despite the officers' contrary warnings and regardless of the consequences, causing public inconvenience,

_____

[8] See Instruction 7.160, Supplemental Instruction 3, of the Criminal Model Jury Instructions for Use in the District Court (2009) ("A person acts recklessly when he consciously ignores, or is indifferent to, the probable outcome of his actions. The defendant was reckless if he [she] knew, or must have known, that such actions would create a substantial and unjustifiable risk of public inconvenience, annoyance or alarm, but he [she] chose, nevertheless, to run the risk and go ahead").

annoyance, and alarm and requiring that traffic be rerouted around his hospital room. The totality of this causal relationship is doubtful, given that the rerouting of hospital traffic was initiated by the security officers as a prophylactic step and there was no evidence that it was actually needed. But even assuming the validity of the Commonwealth's characterization of the scene, the fact that the defendant's behavior caused officers to reroute and inconvenience people does not mean that the defendant was aware that his behavior had this effect, and acted in conscious disregard of its occurrence. No evidence was presented that the defendant ever went out of the room he was in; that he knew of the hospital pedestrian rerouting officers decided to institute; or that he saw any patients "looking on" through the window into the room. Quoting Justice Holmes, the Commonwealth claims that recklessness "in a moral sense" signifies "a certain state of consciousness with reference to the consequences of one's acts," Commonwealth v. Pierce, 138 Mass. 165, 175 (1884), and that a failure to predict the consequences is immaterial if, "under the circumstances known to [the defendant], the . . . jury . . . thought them obvious." Id. at 178. This elegantly phrased observation seems contrary to the Model Penal Code's statement of the standard as set out in comment 2 to § 250.2, but even if Justice Holmes's statement did represent an appropriate articulation of the

standard, by its terms, it depends on "the circumstances <u>known to [the defendant]</u>" (emphasis added). <u>Id</u>. It bears emphasis that at the time of this incident, according to the Commonwealth, the defendant had been brought to and was detained in the hospital's emergency department because he was thought to be dangerous to himself or to others by reason of mental illness. See G. L. c. 123, § 12. We do not decide that a person detained in such circumstances can never satisfy the intent element of the crime of disorderly conduct, but in the circumstances presented here, without any evidence showing or even suggesting that the defendant was at all aware that his conduct had any impact on anyone in the hospital outside his room, the Commonwealth has failed to prove that the defendant acted with the requisite conscious disregard of an "unjustifiable risk" of public annoyance or alarm created by his conduct.

Moreover, quite apart from the element of intent, in the context in which they took place, the defendant's actions do not amount to the sort of "public inconvenience, annoyance, or alarm" that G. L. c. 272, § 53, targets. See Instructing 7.160 of the Criminal Model Jury Instructions for Use in the District Court (2009). Disorderly conduct embraces those activities which "intentionally tend to disturb the public tranquility, or alarm or provoke others" (citation omitted). <u>Commonwealth</u> v. <u>A</u>

Juvenile, 368 Mass. 580, 595-596 (1975).  See Commonwealth v.
Mulvey, 57 Mass. App. Ct. 579, 584 (2003) (characterizing
"tendency of the actor's conduct to provoke violence in others"
as foundational to theory behind criminalizing disorderly
conduct).  The comments to the Model Penal Code note that "[o]ne
of the chief uses of a disorderly conduct statute is to prohibit
public brawling."  Model Penal Code § 250.2 comment 3, at 330
(1980).  Disorderly conduct includes a subset of "tumultuous
behavior," that is, conduct "involving riotous commotion and
excessively unreasonable noise so as to constitute a public
nuisance" (citation omitted). A Juvenile, supra at 597.  See
Sholley, 432 Mass. at 730, and cases cited.

For purposes of G. L. c. 272, § 53, "public" is defined as
"affecting or likely to affect persons in a place to which the
public or a substantial group has access."  Alegata v.
Commonwealth, 353 Mass. 287, 304 (1967), quoting Model Penal
Code § 250.2 (Proposed Official Draft, 1962).[9]  We have

---

[9] See, e.g., Commonwealth v. Richards, 369 Mass. 443, 446-
448 (1976) (defendants in shopping mall refusing to cease public
drinking, shouting obscenities, resisting arrest, and attracting
crowd of about 200 people hostile and abusive to police
warranted disorderly conduct convictions); Commonwealth v.
Sinai, 47 Mass. App. Ct. 544, 548 (1999) (disorderly conduct
conviction upheld where defendant in parking lot of public town
beach was screaming and yelling at parking attendant and then
two police officers, pounding on steering wheel of his
automobile with both hands, attempting to strike two police
officers and forcibly resisting arrest by three police officers,
which attracted crowd of twenty onlookers and caused traffic to

recognized, however, that conduct disruptive in one setting may be tolerable in another.  See Sholley, 432 Mass. at 730 n.11 ("conduct proscribed [under § 53] varies with the setting and the surrounding circumstances").  See also Commonwealth v. Orlando, 371 Mass. 732, 735 (1977), and cases cited (hurling objects in deserted location would not disturb peace while hurling objects in populated area would be violation).

In the Sholley case, we concluded that the threshold for acceptable disruption was lower in a court house than it would be elsewhere, reasoning that

> "the fact that Sholley's threats, yelling and screaming occurred in a court house, while several court rooms were in session, makes the conduct far more damaging to public order than would the same noise level -- or even words suggestive of threats -- at, for example, a sporting event. At a court house, the level and duration of 'commotion' that can be tolerated by the public is relatively low, and the point at which noise becomes 'excessively unreasonable' is also relatively low."

Sholley, 432 Mass. at 730-731.  In concluding that the defendant's outburst "went far beyond the level of noise and

---

be rerouted); Commonwealth v. Mulero, 38 Mass. App. Ct. 963, 964-965 (1995) (during roadside stop, defendant's actions of removing his hands from police cruiser, flailing them in agitated and belligerent manner while berating police officer with loud profanities and shoving his hands into pockets of his shorts while crowd of thirty people gathered was sufficient to constitute probable cause to arrest defendant on charge of disorderly conduct); Commonwealth v. Carson, 10 Mass. App. Ct. 920, 921-922 (1980) (intoxicated defendant who became belligerent when approached by police outside college dormitory and resisted arrest while crowd of about fifty people gathered was guilty of disorderly conduct).

commotion ordinarily encountered in court house hallways," the court considered relevant both the spectators who gathered[10] and "the number of persons who abandoned their ordinary duties to respond to that noise and commotion." Id. at 729. These included a court officer leaving a sitting judge to follow the defendant through the building; an assistant district attorney interrupting a meeting to check on the safety of the attorneys she supervised; and three police officers abandoning their posts to investigate the disturbance. Id. Together, these actions "gave rise to a sense of emergency on the part of those who heard it, an emergency that went way beyond the ordinary 'hurly-burly' to which they were accustomed." Id.

The same cannot be said of the defendant's conduct in this case. His behavior in the emergency department did not attract the crowd of onlookers that typifies public disturbance under our law. See note 10, supra. All the evidence shows is that the behavior was witnessed and experienced by the hospital's treating staff attending the defendant and the security officers called in by the staff. The evidence would permit a finding that unquantified "other" patients may have observed the defendant's loud and aggressive behavior in his room; "other"

_____

[10] These included people "peering out of doors on the second floor to see what was happening," and people who "came out of the first session and the probation department on the first floor." Id. at 730.

patients looking in on a patient arguably out of control in a small hospital room does not qualify as the kind of public disturbance that § 53 is intended to address.

Indeed, far from going "way beyond" a hospital's day-to-day "hurly-burly," a patient's resistance to detention and medication would seem to be the kind of disruption a psychiatric area in the hospital's emergency department is designed to absorb.[11] The responding officers, moreover, were not leaving their posts, but carrying out an assignment that fit squarely within their job to provide security to the hospital community.[12] Where the inquiry is setting-specific, Sholley, 432 Mass. at 730 n.11, criminal charges of disorderly conduct in the context of mental health treatment in the emergency department of a large urban hospital, although not per se unavailable, should be rare. To decide otherwise risks criminalizing mental illness in the very treatment centers where help must be available.

We do not minimize the challenges faced by staff in the psychiatric ward of a large hospital like the one here,

---

[11] Cf. Zun, Care of Psychiatric Patients:  The Challenge to Emergency Physicians, 17 W.J. Emerg. Med. 173, 173 (2016).

[12] One officer testified that his duties as a special police officer at the hospital ranged from "radio calls for service to patrol," and he expressed familiarity with the psychiatric area; another officer identified as his primary responsibility "to make sure that we proactively protect and serve the community at [the hospital]," including patrol; and a third officer was "posted in the emergency department at the hospital."

including the hospital's security officers.  This would be a very different case if the defendant had actually struck a member of the hospital staff or had intentionally or recklessly caused a substantial disruption to other patients or hospital operations.  Here, however, the jury found the defendant not guilty of assault and reached no verdict on the charge of threatening to commit a crime.  The defendant's belligerent actions, given their context and location, do not rise to the level of disorderly conduct.

In sum, considering all the evidence in this case in the light most favorable to the Commonwealth, we conclude that it was not sufficient to permit a reasonable jury to find beyond a reasonable doubt that the defendant consciously disregarded a "substantial and unjustifiable risk of public inconvenience, annoyance, or alarm."  The defendant's conviction of disorderly conduct must be reversed.[13]

b.  Additional considerations.  The defendant argues in this case that his detention in the hospital and the forced administration of medication without his consent were unlawful, and that as a consequence, he was entitled to a jury instruction on self-defense in relation to all three of the criminal charges

---

[13] The defendant may be entitled to a refund of any fine he may have paid.  Cf. Commonwealth v. Martin, 476 Mass. 72, 77-78 (2016) (because distinguishable from punitive fines, probation fees for voidable convictions need not be returned).

against him. We need not reach this issue in light of the fact that the defendant was found guilty only of disorderly conduct, and we have concluded that there was insufficient evidence to support that conviction.

The defendant is correct, however, that as a general matter, the involuntary hospitalization and forcible medication of an individual on account of mental illness is not permitted unless there is compliance with the specific statutory requirements of G. L. c. 123, §§ 12 and 21. It has long been the law that medical treatment of a competent patient without his consent is a battery, and is permitted only for incompetent patients where procedural protections are followed. See, e.g., Matter of Spring, 380 Mass. 629, 638 (1980), and cases cited. See also Rogers v. Commissioner of the Dep't of Mental Health, 390 Mass. 489, 499-500 (1983).

At trial, the judge instructed the jury that "if there is a need to give medications, a hospital follows certain procedures, which we're not getting into here because it has no relevance to this case," and that the "procedures being followed . . . [are] not a part of this case." But the defendant makes the point that the Commonwealth presented no evidence at trial of compliance with either the requirements of G. L. c. 123, § 12, as to the defendant's hospitalization or with those of G. L. c. 123, § 21, as to the defendant's forced medication. Because

adherence to these statutory protections generally is a condition precedent to involuntary hospitalization and medication, we disagree with the judge that evidence on this point has no relevance.  To the contrary, failure to adhere to the protections of G. L. c. 123, § 12 or 21, may well be relevant to consideration of the defendant's requisite intent -- i.e., that a person act intentionally or recklessly to cause or create public inconvenience, annoyance, or alarm.[14]

Conclusion.  The defendant's conviction of disorderly conduct is reversed, the judgment is vacated, and the case remanded to the Boston Municipal Court for entry of a judgment of dismissal.

So ordered.

---

[14] As previously stated, we do not reach the defendant's arguments about a self-defense instruction in this case. However, in connection with criminal charges involving the use of force, evidence of failure to comply with G. L. c. 123, § 12 or 21, may be a relevant consideration in weighing whether a defendant may be entitled to an instruction on self-defense in some circumstances.  Cf. Instruction 9.260, Supplemental Instruction 12, of the Criminal Model Jury Instructions for Use in the District Court (2009) (police privilege; resisting arrest).